## Hammock *v*. Loan and Trust Company.

1. A judge of a Circuit Court in Illinois cannot, in vacation, appoint a receiver of a railroad corporation. The possession of a receiver so appointed is not that of the court.

2. Section 49 of chapter 37, Rev. Stat. Ill., 1874 (p. 332), is to be construed as if there was no comma between the words "to hear and determine motions" and the words "to dissolve injunctions." Punctuation is no part of a statute.

3. The legislation of Illinois, giving the right to redeem mortgaged lands sold under decree, does not embrace the real estate of a railroad corporation mortgaged in connection with its franchises and personal property. Its real estate, personalty, and franchises, so mortgaged, should be sold as an entirety, and without the right of redemption given by statute.

4. The chattel-mortgage statute is inapplicable to an ordinary railway mortgage.

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

To secure the payment of its bonds, aggregating the sum of $660,000, and issued for the purpose of raising money as well for its mining and manufacturing business, as for the completion and maintenance of its road, the Chester and Tamaroa Coal and Railroad Company, an Illinois corporation, executed, on the twelfth day of April, 1871, a deed of trust containing such conditions and provisions as are usually inserted in railway mortgages. It embraced the entire road of the grantor, then made or thereafter to be constructed, from Chester, in Randolph County, to Tamaroa, in Perry County, together with the right of way, and all the real and personal property then owned or subsequently acquired, and used or appropriated for railroad purposes; also, its privileges and franchises for holding, operating, and maintaining the road, together with any income derived from the property, not applied to the construction and repair of the road, the conduct of the business of the company, its current expenses, or the purchase of equipments, tools, and machinery. Subsequently, the mortgagor company was consolidated with the Chester and Iron Mountain Railroad Company, the consolidated company taking the name of the Iron Mountain, Chester, and Eastern Railroad Company.

From the first day of October, 1874, until the fifth day of

June, 1876, the railroad and other property included in the mortgage was in the possession of D. C. Barber, as receiver, in a creditor's suit instituted by one Maxwell in the Circuit Court of the United States for the Southern District of Illinois. On the last-named day, in conformity with a stipulation signed by the attorneys in that suit, Barber was discharged as receiver, without being required to render an account of his acts, and the bill of Maxwell was dismissed at his costs. The present transcript does not show the grounds upon which Barber was appointed receiver, perhaps for the reason, disclosed in an affidavit, that the bill filed by Maxwell was not to be found among the files of his suit.

On the day succeeding Barber's discharge as receiver, Hammock, assignee of two judgments (aggregating less than $1,000), with returns of no property, against the Iron Mountain, Chester, and Eastern Railroad Company, and suing in behalf of himself and such judgment creditors as might unite with him, presented his bill in equity to the judge of the Circuit Court of Perry County, Illinois, in vacation, "at Chambers," in Washington County, Illinois, praying the appointment of a receiver of the railroad company and its effects, with authority to hold and administer the same under the direction of the court, and out of the net income arising therefrom to pay the judgments held by complainant and others. The only grounds assigned in the bill for a receiver are, the indebtedness of the company, the returns against it of *nulla bona*, its insolvency, and its refusal to pay the judgments outstanding against it. The judge, without notice to the company, appointed Thomas M. Sams receiver, and made an order requiring the railroad company, its officers, servants, and agents, to deliver to him all of its property and effects of every kind, upon his presenting the certificate of the clerk of the court that he, Sams, had filed his bond as receiver, in the penal sum of $15,000, with certain named sureties (Barber, then recently the receiver in Maxwell's suit, being one of them), conditioned that he would account for all property and effects coming to his hands, as receiver, under the order and direction of the court. By the terms of the order, Sams was authorized to use and operate the railroad, and pay all expenses incurred in its opera-

tion as far back as Oct. 1, 1874, nearly two years prior to his appointment. The bill of Hammock, with the foregoing order indorsed thereon, was filed in the clerk's office on the 7th of June, 1876, and Sams, having executed the required bond, took possession of the railroad and all the property and effects of the company.

On the thirteenth day of June, 1876, the Farmers' Loan and Trust Company — without knowledge, as we infer from the record, of the suit in the State court — commenced proceedings in the court below for the foreclosure of the beforementioned mortgage, and to obtain a decree for the sale of all the property embraced by it, in satisfaction of the interest and principal of the bonds thereby secured, the whole amount of which had, under the terms of the mortgage, become due by reason of the continued default of the company in meeting the interest as it matured. The bill (verified under date of June 2, 1876) and the supplemental bill charged that the consolidated company was insolvent; that its entire property was inadequate for the payment of the mortgage debt; that divers persons, by defaults and collusions with Barber, late receiver, had obtained judgments against the company, and had levied, or were about to levy, upon its rolling-stock and other movable property; with the intent to deprive the trustee and those it represented of the benefit of their security; that the company itself was a party to that fraudulent collusion; that the bill of Maxwell had been dismissed, and Barber, as receiver, discharged, to the end that such levies might be made; that these facts had only then come to complainant's knowledge; and that, if time was taken to give notice of an application for an injunction and a receiver, great and irreparable loss would ensue to the trustee, and those whose interests it represented.

Upon the filing of the original and supplemental bill the Federal court appointed a receiver, with direction to take possession of the mortgaged property, and, at the same time, issued an injunction against judgment creditors interfering with or taking possession of it. A few days thereafter the Farmers' Loan and Trust Company filed in the office of the clerk of the Perry Circuit Court its petition to be made a party defendant in the suit of Hammock, also its answer and cross-bill therein,

and its petition, accompanied by proper bond, for the removal of the suit into the Circuit Court of the United States. An application was subsequently made by the complainant to the judge of the State court, in vacation, to discharge Sams, as receiver, upon the ground, among others, that he was illegally appointed in the vacation of court. That motion was denied; and thereupon the company made an application, based upon the before-mentioned papers, to the judge, in vacation, to be admitted as a party to Hammock's suit. But in reference to that application the judge declined to take action, upon the ground that he could not legally do so in the vacation of his court.

On the nineteenth day of July, 1876, the Farmers' Loan and Trust Company, having filed a certified transcript of the proceedings in the Hammock suit, including copies of all the foregoing papers, moved the Federal court to take jurisdiction of that suit. That motion — Mr. Justice Davis and the district judge concurring — was sustained, and an order made that the Hammock suit proceed in that court as if originally commenced there, and be consolidated with the mortgage suit. It was further ordered that Sams surrender to the receiver of the Federal court all property in his hands, as receiver, and pay over all funds by him in that capacity collected. That order was immediately executed, and thenceforward the mortgaged property was in the actual and exclusive custody of the Federal court by its receiver.

At the November Term, 1876, of the State court a motion was made by Hammock to strike from the files of his suit the answer, cross-bill, and the petition for the removal of the cause, previously filed therein by the Farmers' Loan and Trust Company, upon the ground that they had been so filed without leave of court, and because that company was not a party to the suit. That motion was sustained on the fourth day of May, 1877, and all of those papers were stricken from the files.

Nothing occurred in the progress of the consolidated cause which need be referred to, except that the court, in response to a suggestion by the attorney-general of the State, and by consent of parties (all the judgment creditors interested in Hammock's suit having appeared, in some form, in the consolidated

cause, saving, however, all questions as to the jurisdiction of the Federal court), an order was made, under which the receiver surrendered to county collectors the rolling-stock and personal property of the company in his hands to be levied on and sold. It was levied on and sold for State, county, school, and other taxes assessed in Randolph and Perry Counties upon the property in the receiver's hands for the years 1873 to 1876, inclusive. That portion sold in Randolph County brought $6,053.92, which, after deducting costs of sale, satisfied in full the taxes due in that county on the real and personal estate of the railroad company, and all of the tax on its capital stock, except $999.93. The sale in Perry County netted the sum of $5,165, which satisfied in full the taxes due and collectible in that county on the company's real and personal estate, and all of the capital-stock tax, except $852.39.

A final decree was made on the eleventh day of January, 1878, for the sale of the mortgaged property, including the franchises of the company, as an entirety, to satisfy the principal and interest due on the bonds, then amounting to $940,625.40. The sale was directed to be made "without appraisement and without reference, and not subject to any law or laws of Illinois allowing redemption from mortgage sales, but absolutely without redemption." Henry C. Cole became the purchaser of the entire property at the sum of $50,000. The sale was subsequently confirmed and a deed made to the purchaser, who was let into possession on the twenty-sixth day of April, 1878.

On the seventeenth day of October, 1878, the Wabash, Chester, and Western Railroad Company, an Illinois corporation, to which had been conveyed by Cole, after the confirmation of his purchase, the railroad and other property sold under the foregoing decree, represented to the court below, by petition, that Hammock and other judgment creditors, parties to the consolidated cause, had then recently caused Sams, still pretending to be the legal receiver of the property sold in the foreclosure suit, to advertise the same for sale, without redemption, under an order or decree of the Perry Circuit Court, made in Hammock's suit after the execution of the final decree in the foreclosure suit, to wit, on the eleventh day of May, 1878; and

that, unless restrained, such sale would be had in disregard of
the decree of the Federal Court. Upon this petition a tempo-
rary injunction was issued, and Hammock, Sams, and others
were required to show cause why they should not be attached
for contempt of court.

Upon final hearing the temporary injunction of Oct. 17,
1878, was, by an order entered on the seventeenth day of Jan-
uary, 1879, perpetuated, and Sams, Hammock, and their asso-
ciates were enjoined from taking any steps in execution of the
decree of the Circuit Court of Perry County, from selling
any part of the railroad property theretofore sold under the
decree of the court below, and from interfering with it in any
manner.

The present transcript embraces two appeals, one from the
several orders and the final decree under which the mortgaged
property was sold, and the other from the final order or decree
of Jan. 17, 1879.

The case was argued by *Mr. James K. Edsall* for the appel-
lants, and by *Mr. Robert E. Williams* for the appellees.

MR. JUSTICE HARLAN, after stating the facts, delivered the
opinion of the court.

Whether the State court or the Circuit Court of the United
States first acquired control and possession of the property con-
veyed in trust by the Chester and Tamaroa Coal and Railroad
Company, is the first question to which our attention will be
directed. If, when seized under the order of the Federal court,
it was in the custody of the State court, by its receiver, then,
it is claimed, that all the proceedings in the former, so far at
least as their regularity and validity depended upon possession
of the property, were in violation of the established principles
governing courts of concurrent jurisdiction in their relations to
each other. *Peck* v. *Jenness*, 7 How. 612; *Taylor* v. *Carryl*,
20 id. 583; *Freeman* v. *Howe*, 24 id. 450; *Hagan* v. *Lucas*, 10
Pet. 400.

The solution of this question, it must be conceded, depends
upon the authority which the judge of the State could lawfully
exercise in vacation; for if, under the laws of the State, he
had no power in vacation to appoint a receiver of the property

and effects of a railroad company, the order under which Sams took possession was a nullity, and his custody was not that of the court which he assumed to represent.   Counsel for appellants admits that, except to the extent expressly permitted by statute, the judge of the State court could not exercise any judicial functions in vacation.   Such, beyond question, is the established doctrine of the Supreme Court of Illinois.   In *Blair v. Reading* (99 Ill. 600), the court said: "It is a fundamental principle that courts can exercise judicial functions only at such times and places as are fixed by law, and that the judges of courts can enter no orders in vacation, except such as are expressly authorized by statute."   In *Devine v. People* (100 id. 290), the language of the court was that "judges can exercise no judicial functions in vacation, except such as they are especially authorized to do by statute."   *Keith v. Kellogg,* 97 id. 147.

It is stated by counsel, and our examination verifies the correctness of the statement, that in the few cases in which the statutes of Illinois make special provision for the appointment of a receiver, the power is conferred upon the court, and not upon the judge thereof.   Rev. Stat. Ill., 1874, sect. 25, p. 290; id., sect. 24, p. 553; id., sect. 88, p. 613.

But the action of the judge of the State court is attempted to be sustained under the forty-ninth section of chapter 37 of the Revised Statutes of Illinois, enacted in 1874 (p. 332), which is in these words: —

"SECT. 49.   *Powers of judges in vacation:*  The several judges of said courts [judges of the Circuit Courts, and of the Superior Court of Cook County] shall have power, in vacation, to hear and determine motions, to dissolve injunctions, stay or quash executions, to make all necessary orders to carry into effect any decree previously rendered, including the issuance of necessary writs therefor, to order the issuance of writs of *certiorari,* to permit amendments in any process, pleading, or proceeding in law or equity.   Any order so made shall be signed by the judge making it, and filed and entered of record by the clerk of the court in which the proceeding is had, and from the date of such filing shall have like force and effect as if made at a regular term of such court.   The pendency of a term of court in another county than that in which the suit is pending,

or about to be commenced by the same judge, shall not prevent the granting of such order.   L. 1871–72, p. 504, sects. 1, 2."

The succeeding section (sect. 50) provides that "no such order shall be granted in vacation unless the party applying therefor shall give the opposite party, or his attorney of record, reasonable notice of his intended application."

We are of opinion that the authority of a judge, in vacation, to appoint a receiver of a railroad corporation cannot be derived from the foregoing section.  This precise question has not, that we are aware, been determined in the Supreme Court of Illinois.  But what fell from that learned tribunal in the cases already cited leads us to believe that when the question is directly presented it will be determined in accordance with the view we have just expressed.

In the argument before us attention was called to the fact that between the words in sect. 49, "to hear and determine motions," and the words "to dissolve injunctions," there appears a comma; and that was, to some extent, relied on as showing that a judge in vacation could hear and determine motions of every kind, not simply those relating to matters specially defined in that section.  While the comma after the word "motions," if any force be attached to it, would give the section a broader scope than it would otherwise have, that circumstance should not have a controlling influence.  Punctuation is no part of the statute.  Lord Kenyon, C. J., in *Doe* v. *Martin* (4 T. R. 65), said that courts in construing acts of Parliament or deeds should read them with such stops as will give effect to the whole.  Sedgwick's Constr. Stat. and Const. Law (2d ed.), 223, note *a*; Bouvier's Law Dic. 347, 402.  The general rule is well illustrated in Barrington's Statutes (4th ed.), 438, note *x*; *Price* v. *Price*, 10 Ohio St. 316; *Cushing, &c.* v. *Worrick*, 9 Gray (Mass.), 382; *Geiger's Estate*, 65 Pa. St. 311; and *Hamilton* v. *Steamer R. B. Hamilton*, 16 Ohio St. 428.  In the last case it was said: "But for the punctuation, as it stands, there could be little doubt but that this was the meaning of the legislature.  Courts will, however, in the construction of statutes, for the purpose of arriving at the real meaning and intention of the law-makers, disregard the punc-

tuation, or repunctuate, if need be, to render the true meaning
of the statute." Apart from the general rule upon this subject,
there are reasons why the punctuation of sect. 49 should not
control its interpretation. It will be observed that at the close
of that section is a reference to the laws of Illinois passed at
the session 1871–72 of the General Assembly, indicating that
sect. 49 was, in part at least, founded upon an existing or pre-
vious statute. One of the rules prescribed by the revision of
1874 for the construction of statutes is that "the provisions of
any statute, so far as they are the same as those of any previous
statute, shall be construed as a continuation of such prior pro-
visions, and not as a new enactment." Rev. Stat. Ill., 1874,
p. 1012, sect. 2. Turning then to the previous law,— the act of
March 7, 1872, — we find no comma after the word "motions,"
but the statute reads, "to hear and determine motions to dis-
solve injunctions," &c. Sess. Laws, Ill., 1871–72, p. 504. We
are not prepared to hold that the power of a judge in vacation
to appoint a receiver of a corporation, charged with important
public duties, was conferred by the introduction of a comma
into the Revised Statutes of a State, where the established
doctrine is that no judicial functions can be exercised by a
judge, in vacation, except where expressly or specially author-
ized by statute.

But if, as the argument of counsel would imply, a judge, in
vacation, may, by virtue of the powers conferred by sect. 49,
hear and determine every matter presented by way of motion,
and not simply motions relating to the dissolution of injunc-
tions, to staying or quashing executions, to orders carrying
into effect decrees previously rendered, to writs of *certiorari*, or
amendments in process, pleading, or proceedings in law and in
equity, — which are the subjects specifically referred to in that
section, — we are satisfied that an application to dispossess
those in control of a railroad corporation, whose road is de-
clared by the Constitution of the State to be a public highway,
and to place its entire property in the hands of a receiver, is
not, within the meaning of the statute, a motion which may be
heard and determined by the judge out of term time. It is
rather a proceeding involving the exercise of the highest discre-
tion, and embracing a very wide field of judicial investigation

and inquiry. The injustice which may result from the exercise of such a power in vacation is well illustrated in this case by the fact that, while the judge of the State court did not doubt his power, out of term time, to oust those in the control of a public corporation, and appoint a receiver, with authority to carry on the business of a carrier of freight and passengers, he could not, under his view of the statute, determine, in vacation, an ordinary motion to become a party to the suit, made by the trustee in a first mortgage or deed of trust covering the entire property and franchises in question.

It results from what has been said that the seizure of the property by the receiver of the Federal court was not an interference with the possession of the State court, nor in derogation of its authority. The property was not, in any legal sense, then in the custody of the State court, or of any officer by it appointed. It was, when seized by order of the Federal court, in the custody of one who assumed, without lawful authority, to represent the State court, but who in fact proceeded under a void order of a judge in vacation.

The Circuit Court of the United States, having thus lawfully acquired possession of the property, prior to any action in reference to it by the State court, the former had the right to retain possession for all the purposes of the suit for foreclosure of the mortgage of the 12th of April, 1871. Under the final decree of foreclosure it was, as we have seen, sold in satisfaction of the mortgage debt, leaving nothing to be applied on the claims of Hammock and other judgment creditors.

We proceed now to inquire whether, in the orders or decrees under which the property has been disposed of, any error has been committed to the prejudice of the substantial rights of appellants. On their behalf it is suggested that the decree was erroneous, in that it required the sale of the real estate, covered by the mortgage, to be made absolutely and without the right of redemption allowed by the local statutes in decretal sales of mortgaged lands. The question is one of great importance, and has received, upon our part, all the consideration which it demands.

By the statutes of Illinois, in force when the mortgage was made, real estate, taken in execution, if susceptible of division,

is required to be sold in such quantities as may be necessary to satisfy the execution and costs. Rev. Stat. Ill., 1869 (Gross ed.), p. 397, sect. 11. And it is made the duty of the sheriff or other officer, selling lands or tenements, by virtue of an execution, to give to the purchaser, or purchasers, a certificate, in writing, describing the lands or tenements purchased, and the sum paid therefor, or, if purchased by the plaintiff in the execution, the amount of his bid, and the time when, if the property be not redeemed, the purchaser will be entitled to a deed. Id., p. 380, sect. 15.

It is further provided that the defendant, his heirs, executors, administrators, or grantees, might, within twelve months from the sale of his lands or tenements, under execution, redeem the same by paying to the officer who sold it, for the benefit of the purchaser, the sum of money which may have been paid on the purchase, or the amount given or bid, if purchased by the plaintiff in the execution, together with interest thereon at the rate of ten per centum from the time of sale. Id., sect. 16. The right was given to any judgment creditor, after the expiration of twelve, and within fifteen, months from the sale, to redeem the property, by paying the amount paid by the purchaser,—such payment entitling him to have a resale under the execution upon his own judgment. Id., sects. 17, 18. This right, given to judgment creditors, could be exercised as to the whole, or any part, of the lands or tenements sold, provided the redemption is made in the like distinct quantities, or parcels, in which the same are sold. Id., sect. 19.

If the lands or tenements so sold are not redeemed by the defendant, or by a judgment creditor, within fifteen months from the sale, it is the duty of the officer making it to execute a deed to the purchaser. Id., sect. 25.

The provision in reference to redemption from mortgage sales is that, " where lands shall be sold under and by virtue of any decree of a court of equity for the sale of mortgaged lands, it shall be lawful for the mortgagor of such lands, his heirs, executors, administrators, or grantees, to redeem the same in the manner prescribed for the redemption of lands sold by virtue of executions issued upon judgments at common law ; and judgment creditors may redeem lands sold under any such

decree, in the same manner as is prescribed for the redemption of lands in like manner sold upon executions upon judgments issued at common law." Id., p. 382, sect. 27.

The history of the right of redemption, as given by the laws of Illinois, may be traced in Statutes of 1825, p. 151; Rev. Stat., 1829, p. 85; id., 1833, p. 374; id., 1845, p. 302. When originally conferred as to sales of land under execution, there were no railroads in that State, and very few, if any, when it was first (in 1845) extended to decretal sales of mortgaged lands.

In *Brine* v. *Insurance Company* (96 U. S. 627), we held that the right of redemption given by the Illinois statutes constituted a rule of property which the Federal court, sitting in equity in that State, is bound to recognize and enforce. The property there in controversy was a lot of ground in the city of Chicago, which had been owned by a private person, who conveyed it in trust to secure a loan of money by an insurance company.

When the mortgage by the Chester and Tamaroa Coal and Railroad Company was made, there was in force a general statute, passed in 1855, conferring upon any railroad company organized or incorporated under the laws of Illinois the power to mortgage all or any portion of its property and franchises to secure the payment of money borrowed to aid in the construction, completion, or operation of its road. Gross ed., p. 553; Laws of Ill., 1855, p. 304.

And by the State Constitution adopted in 1870, railroads thereafter constructed were declared to be public highways, free to all for the transportation of their persons and property thereon, under such regulations as should be prescribed by law. Art. 11, sect. 12.

The question is, therefore, presented for the first time in this court, whether the statutory provisions giving the right to redeem as well lands or tenements sold under execution as mortgaged lands sold under decrees of courts of equity, has any application to the real estate of a railroad corporation, which, with its franchises and personal property, is mortgaged, as an entirety, to secure the payment of money borrowed for railroad purposes.

Undoubtedly in all such cases the chief value of the real estate comes from the right or franchise to hold and use it, in connection with the personal property of the corporation, for railroad purposes. It is equally true, not only that the bonds, to secure which the mortgage is given, could not be negotiated in the markets of the country did not the mortgage embrace as an entirety the franchises and all the real and personal property of the corporation used for railroad purposes, but that a sale of the real estate, franchises, and personal property, separately, might, in every case, prove disastrous to all concerned, and defeat the ends for which the corporation was created, with authority to establish and maintain a public highway.

It is, nevertheless, contended by counsel that, as the statute attaches to decretal sales of mortgaged lands the right of redemption, that right exists as well in cases of mortgages, covering the entire property and franchises of a railroad corporation, as where the land is owned and used by private persons for exclusively private purposes.

In other words, — for to that result the argument would lead, — the court, in decreeing the sale of the mortgaged property and franchises of a railroad corporation, has no discretion, if the corporation or its judgment creditors so demand, except to order the sale of the real estate separately, in parcels when susceptible of division, and subject to redemption, leaving the franchises and personal property to be sold absolutely and without redemption. Thus, one person might become the purchaser of the real estate, another of the franchise, and still others of the personal property. If the railroad company should redeem the real estate, it could not employ it to any valuable end; for, its franchise to be a corporation and to use its real estate for railroad purposes, will have been sold to another, and there is no right under the statute to redeem the franchise, it not being real estate, but rather a power or privilege, partaking more or less of sovereignty, and which may not be exercised without a special grant. 1 Redfield on Law of Railways, 94. Consequences equally injurious would flow even from the sale, as an entirety, of the real and personal property and franchises of the corporation, if the right was reserved to the company, or its creditors, to redeem the realty. Individuals or associations

desiring railroad property would not purchase when they could not know, until the expiration of fifteen months from the confirmation of the sale, whether they were to have all for which they might bid. During that period of uncertainty the property would necessarily depreciate in value for the want of repairs and betterments essential to its preservation. A construction of the statute which leads to such results ought not to be adopted, if it can be avoided. And we think it can be without contravening the spirit of the statute or the public policy which suggested its enactment.

We are of opinion that mortgaged real estate, to which is attached the right of redemption, is such and such only as could at law be levied upon and sold on execution. The right does not extend to real estate of a public corporation, mortgaged with its franchise to acquire, hold, and use property for public purposes, and whose chief value depends upon its being so used and appropriated. The difference between real estate, so acquired, held, and used, and real estate which may, at law, be sold under execution, is well illustrated in *Gue* v. *Tide Water Canal Co.*, 24 How. 257. In that case it appeared that an execution was levied upon a house and lot, sundry canal locks, a wharf-boat, and several lots, the property of the canal company, chartered under the laws of Maryland for the construction of a canal from Havre de Grace, in that State, to the Pennsylvania line. The property so levied upon was admitted to be necessary to the uses and working of the canal, which was a public improvement, and a great thoroughfare of trade. It was of little value apart from the franchise to take tolls, and if sold separately under execution, the franchise to take tolls, said Mr. Chief Justice Taney, speaking for the court, would not have passed to the purchaser. It was consequently ruled that the real estate there in controversy could not be seized and sold under *fieri facias*, and, consistently with the rights of stockholders and creditors, could not be sold separately from the franchise from which was derived its chief value.

The laws of the State of Illinois having permitted the Chester and Tamaroa Coal and Railroad Company to mortgage its franchises and property as an entirety, it was, we think, the duty of the court to decree the sale, as an entirety, of the

whole property, so mortgaged, without reference to the local statutes upon the subject of redemption. Real estate, thus mortgaged with the franchises of the company, is of necessity relieved from the operation of that statute. There may possibly be cases in which real estate, of an ordinary kind, owned and mortgaged by a railroad corporation, cannot be sold by decree of court, except subject to the right of redemption; as when it is not used for necessary railroad purposes, or when it is mortgaged separately from its franchises and other property. What may be the operation of the statute in such cases we do not now decide. All that we do decide is, that, by the laws of Illinois, the real estate, franchises, and other property of a railroad corporation, mortgaged as an entirety, may be sold, as an entirety, under the decree of a court of equity, without any right of redemption in the mortgagor or in judgment creditors as to such real estate.

The construction we have given to the statute is not inconsistent with the provision of the State Constitution which declares that " the rolling-stock and all other movable property, belonging to any railroad company or corporation in Illinois, shall be considered personal property, and shall be liable to execution and sale in the same manner as personal property of individuals; and the General Assembly shall pass no law exempting any such property from execution and sale." Art. 11, sect. 10.

When the mortgage of April 12, 1871, was executed, there was no levy upon the movable property of the company, and consequently the rights of the mortgagee were superior to the lien arising from a subsequent levy, by execution, upon the movable property. The State Constitution did not forbid the creation, by mortgage, of such superior lien.

So far from that section militating against the construction we have given the statute, it rather fortifies it. It furnishes a strong implication that the right to levy an execution upon the movable property of a railroad corporation was intended to be restricted to that kind of corporate property. It is a partial modification of the general rule that the property of a railroad corporation, used for necessary railroad purposes, cannot be seized and sold under an execution at law.

The next question to be considered relates to the distribution of the proceeds of the sale of the mortgaged property. The argument, upon this branch of the case, in behalf of the appellants, briefly stated, is this: That by the laws of the State in force when the mortgage of April 12, 1871, was executed, a mortgage of personal property, certified by a justice of the peace in the justice's district in which the mortgagor resides, and recorded in the recorder's office of the county where the mortgagor resides, shall, " if *bona fide,* be good and valid from the time it is so recorded, for a space of not exceeding two years, notwithstanding the property mortgaged or conveyed by deed of trust may be left in possession of the mortgagor, provided that such conveyance shall provide for the possession of the property so to remain with the mortgagor," Gross ed., 1869, p. 67; that more than two years having expired, after the execution of the mortgage of April 12, 1871, and before the suit for foreclosure, — the property mortgaged remaining in the possession of the railroad company until seized in Hammock's suit, — the judgment creditors, by virtue of their suit in the State court, acquired a lien, at least upon the rolling-stock and other movable property covered by the mortgage, superior to any claim on the part of the mortgagee and those it represented; and that since the personal property was surrendered and the proceeds of its sale applied in discharge of taxes upon the real and personal property and capital stock of the corporation, the court upon principles of equity should have appropriated to the judgment creditors so much of the proceeds of the decretal sale as was equal to the taxes on real estate paid from the proceeds of the sale of personal property by the collectors.

We are of opinion that the statutory provisions in regard to chattel mortgages (Gross ed., p. 66) do not embrace mortgages by a railroad corporation, in connection with its real estate and franchises, of its personal property used and appropriated for railroad purposes. The statute provides a mode by which possession of the mortgagor of personal property should not defeat the mortgage, viz. the acknowledgment and record of the mortgage. The acknowledgment is required to be made before a justice of the justice's district in which the mortgagor

resides, and recorded in the recorder's office of the county where he resides.   These directions are wholly inapplicable to a railroad company, whose line of road might pass through several justices' districts and extend through several counties. And, if the construction contended for be sound, a railway mortgage security, so far as the personalty of the corporation is concerned, would cease to be of any value after the expiration of two years from its execution, unless the mortgagor, before the expiration of that time, takes possession of it, — the authority to do which, in advance of the maturity of the mortgage debt, and when there has been no default of the corporation in meeting its interest, would render the negotiation of the mortgage bonds difficult if not impossible.   Clearly the chattel-mortgage statute has nothing to do with the present case.

What we have said renders it unnecessary to consider the other branches of the proposition last stated, and disposes of all questions of importance upon the merits, arising on the appeal from the final decree ordering a sale of the mortgaged property, and directing a disposition of the proceeds arising therefrom.

We have seen that the Farmers' Loan and Trust Company, in vacation, filed in the clerk's office of the State court a petition to be made a party to the creditor's suit of Hammock, with an answer and cross-bill, and also a petition for the removal of that suit into the Federal court, accompanied by the required bond; and that the judge of the State court, in vacation, declined to act upon the petition to be made a party, or to recognize the right of removal.   Whether the cause was, under these circumstances, properly docketed in the court below as one legally removed under the act of Congress, or whether the Federal court exceeded its authority in the final order of injunction, made on the seventeenth day of January, 1879, upon the petition of the Wabash, Chester, and Western Railroad Company, are questions about which there is a difference of views among those members of the court who heard the cause and participated in its decision.   We, therefore, forbear to make any expression of opinion upon them.   And it is not at all important to the parties that we should do so.   The object of the suit in the State court was to reach the property

of the railroad company, and from it, or from the income to be derived therefrom, obtain satisfaction of the judgments against the corporation. Whether that suit was or not, under the act of Congress, legally removed into the Federal court, the entire property, we have seen, passed lawfully into the custody of the latter court, and by proceedings therein, to which the judgment creditors were parties, and by which they are concluded — it has been all sold, and the proceeds adjudged to be rightfully distributed in satisfaction of the mortgage debt. It would, consequently, serve no valuable purpose for the appellants, were it now decided that the suit commenced in the State court was not legally removed into the Federal court, or that the order of Jan. 17, 1879, was beyond the power of that court to make.

The decrees appealed from are, therefore,

*Affirmed.*

MR. JUSTICE GRAY did not sit in this case, nor take any part in deciding it.