(97 Misc. Rep. 57)

WESTERN NEW YORK WATER CO. v. WHITEHEAD, Mayor, et al.

(Supreme Court, Special Term, Erie County.   October 4, 1916.)

1. WATERS AND WATER COURSES ☞183(1)—CITY CHARTER—CONSTRUCTION—
WATERWORKS.

Charter of City of Niagara Falls (Laws 1916, c. 530) § 69, providing that the council shall have power to purchase and operate a new waterworks system or waterworks plant, and such pipes, machinery, etc., as it may deem advisable, and to purchase or condemn such property as it may deem necessary, and section 70, providing that when the council shall determine to exercise any of such powers it shall submit the matter to a vote of the resident taxpayers, have no application to an improvement of the city water supply system, but relate to the power to acquire, by purchase or condemnation, the property owned or operated by some existing corporation, and to procedure to be followed.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 277, 278; Dec. Dig. ☞183(1).]

2. WATERS AND WATER COURSES ☞183(1)—CITY CHARTER—CONSTRUCTION—
WATERWORKS.

Although Charter of City of Niagara Falls, § 44, subd. 1, provides that the city manager shall have general charge of the various city departments, excepting the department of public construction, under section 68, providing that the council shall have the supervision, management, and control of the waterworks of the city, the city manager has no authority over the department of water, and his duty under section 44, subd. 7, to present to the city council a written statement of any improvement or betterment, has no application to the department of water, and the city council may act on its own initiative in the matter, so that section 125, providing that statements relating to the public improvements made to the city council by the city manager with certain exceptions shall be submitted to the vote of the resident taxpayers, relates only to those recommendations and statements the city manager is required to make under section 44, and does not relate to contemplated improvements or betterments to the water supply system of the city.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 277, 278; Dec. Dig. ☞183(1).]

3. WATERS AND WATER COURSES ☞183(1)—CITY CHARTER—CONSTRUCTION—
WATERWORKS.

Where Charter of City of Niagara Falls, § 125, providing for the submission of any statement relating to public improvement made to a city council by the city manager to the vote of the resident taxpayers, or other provisions of the charter, did not require such submission with regard to recommendations and statements of improvements relating to the department of water, the fact that the city manager did in fact recommend the laying of an additional water main, and the city council acted on his recommendation, did not affect the authority of the city council to act without, or independent of,· any such statement or record.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 277, 278; Dec. Dig. ☞183(1).]

4. MUNICIPAL CORPORATIONS ☞911—CITY CHARTER—CONSTRUCTION—WATER-
WORKS.

Under Charter of City of Niagara Falls, § 68, providing that the council shall have the supervision and control of the waterworks of said city, and shall have power to improve, extend, and repair said waterworks plant and system, and the water mains and apparatus connected therewith "and appurtenant thereto;" and to construct and operate a power plant and develop other power for the operation of such waterworks plant, and if sufficient money shall not be available for such purposes to sell the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

bonds of the city therefor, although the semicolon after "thereto" as a matter of punctuation would seem to confine authority to issue bonds to the proposition following it, the intention of the Legislature being controlling the use of the word "purposes" indicates a reference to all things specified in the entire subdivision, and confers authority on the city council to issue bonds to raise funds to pay for the cost of construction of a new water main.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1899, 1901; Dec. Dig. ☜⚏911.]

Action by the Western New York Water Company against George W. Whitehead, as Mayor of the City of Niagara Falls, and others. Motion for the continuance of a temporary injunction. Motion denied, and temporary restraining order dissolved.

Edward H. Letchworth, of Buffalo, for plaintiff.

Robert J. Moore, Corp. Counsel, of Niagara Falls, for defendants.

WHEELER, J. This action is brought by the plaintiff as a taxpayer of the city of Niagara Falls to enjoin the defendants from constructing or causing to be constructed a public improvement to the water supply system of the city of Niagara Falls, consisting of the laying of a new 36-inch water main from the pumping station of its plant for the distance of about a mile into the city, and from issuing, negotiating, and selling some $72,000, face value, of bonds proposed to be issued, with which to provide funds for the payment of such improvement.

The plaintiff contends the city has no authority to make the improvement in question, or to issue bonds therefor, without first submitting the proposition to the vote of the resident taxpayers of the city, as provided by section 125 of the present charter of said city.

The papers in the case show that on the 7th day of August, 1916, the "city manager" presented to the city council a written statement recommending a public improvement to the water system of the city, of the character described. Thereupon the city council approved the recommendation of the city manager, and authorized the city manager to contract with the defendant United States Cast Iron Pipe & Foundry Company for the purchase of the necessary pipe, etc.

On the same day, by a separate resolution, the city council, after reciting there was insufficient money available to pay for this improvement, authorized the issue of bonds to the amount of $72,000 to raise funds to meet the estimated cost of said improvement, and authorized the city manager to sell said bonds in accordance with the provisions of subdivision 3, § 44, c. 530, of the Laws of 1916, constituting the charter of said city.

The complaint sets forth certain provisions of the city charter, as follows:

"Sec. 68. The council shall have the supervision, management and control of the waterworks of said city, and shall have power: (1) To improve, extend, enlarge, alter, and repair said waterworks plant and system, and the water mains, pipes and machinery, and apparatus connected therewith and appurtenant thereto; and to construct, maintain and operate a power plant and develop and generate electrical or other power for the operation of such waterworks plant and system, and if sufficient money shall not be available for such purposes, to issue and sell the bonds of the city therefor. * * *

"Sec. 69. The council shall, subject to the provisions of the next section, have power: * * * (2) To purchase, construct, maintain and operate a new water supply system, a new or additional waterworks plant, a filtration plant, and such mains, pipes, pipe lines, tunnels, intakes, machinery, apparatus and appurtenances, as it may deem advisable, and in the name of the city to purchase, or acquire and take in the manner prescribed by the condemnation law, such lands or property within or without the city as it may deem necessary for such purpose.

"Sec. 70. Whenever the council shall determine to exercise any of the powers conferred by the preceding section, it shall prepare a plan or prospectus, in writing, setting forth briefly the work proposed to be done, or a description of the lands or property proposed to be purchased or acquired by condemnation, or both, as occasion may require, and submit the same to a vote of the resident taxpayers of said city at a tax election to be called, noticed and held as herein provided. * * * If a majority of all the votes cast at such election shall be in favor of the proposition, the council shall have power to forthwith proceed with the work, or to purchase or to acquire by condemnation the lands or property specified in said proposition, or both, as the case may be, and to issue the bonds of the city therefor in the manner and form herein provided."

"Sec. 125. If any statement relating to the public improvements made to the city council by the city manager shall relate to any subject other than sewers and bridges over Gill creek, street improvements, lighting and cleaning of the streets, collection and disposal of sweepings, garbage, ashes and refuse, recommendation of any such statement of said city manager, if approved by the city council, shall be submitted to the vote of the resident taxpayers of said city at a special election called and noticed in the manner herein provided."

The plaintiff contends that, by virtue of the provisions of section 125, this bond issue can be made only after the matter has been approved by the vote of resident taxpayers.

[1] It is evident that sections 69 and 70, above quoted, have no application to the case in hand, because section 69 relates to the power to acquire by purchase or condemnation the work, plant, franchises, pipes, etc., owned or operated by some existing corporation, and has nothing to do with the "waterworks of said city" owned and operated by the municipality itself. Section 70 relates only to the procedure to be followed in the event the city "shall determine to exercise any of the powers conferred by the preceding section," i. e., section 69.

Therefore it is that the plaintiff must stand or fall in this action upon the question whether section 125, above quoted, prohibits the improvement undertaken without the approval of the resident taxpayers of the city.

[2, 3] The defendants contend that section 68 confers on the city council the power and authority to do the things undertaken, independent of any recommendation from or control of the city manager, or the approval of or veto by the resident taxpayers.

A study of the charter of the city shows some peculiar and apparently inconsistent provisions.

At the general election of 1914, the voters of the city of Niagara Falls adopted what is known as the commission form of government; the particular form of government being known as "Plan C," provided for by chapter 444 of the Laws of 1914. At the election of 1915, a mayor and four councilmen were elected under this form of government, and took office on the 1st of January, 1916, at which time the

new government went into operation.  However, a new and modified charter for the government of the city was passed by the Legislature of 1916 (chapter 530, Laws of 1916), which is the charter now under consideration.  This charter provides for a "city manager" chosen by the council.  His powers and duties are defined by section 44 of the charter.  This section is long, covering nearly six pages of the printed charter.  By this section it is provided, among other things:

"The administrative and executive powers of the city, including the power of appointment of officers and employés, are vested in the city manager. * * * (1) The city manager, subject to the direction of the city council, shall discharge the duties imposed upon him by statute, and shall have general charge and supervision of the various departments, bureaus and offices, and employés thereof, of said city, excepting the department of public instruction. * * * (3) It shall be the duty of the city manager to investigate and make arrangements * * * and sale of all bonds and certificates of indebtedness issued by the city to the highest bidder therefor and report the same to the city council for its consideration. * * * " (4) He is to let "contracts" for "supplying * * * any materials for each of the boards, departments, bureaus or offices of the city respectively, except school and library books and school apparatus. * * * " (7) In this subdivision it is provided: "The city manager may present to the city council a written statement of any * * * improvement or betterment including the purchase of * * * property to be acquired by purchase or * * * eminent domain for the city. * * * " And then follows certain provisions as to the procedure in case the improvement relates to bridges or sewers, and other requirements when it relates to paving. (9) Gives the city manager power to change or modify contracts.

It will thus be seen that there is nothing in section 44 which in terms exempts any department or bureau of the city from the management and general charge and supervision of the city manager, saving the educational department of the city.

Were it not for the subsequent provisions of section 68 of the charter, we should hold that the supervision, management, and control of the water supply system were given by the charter to such city manager.  There is no reason why, in framing the charter, this department of the public service of the city should not have been specifically exempted.

Nevertheless, we find that section 68 reads:

"The council shall have the supervision, management and control of the waterworks of said city, and shall have power: (1) To improve, extend, enlarge, alter, and repair said waterworks plant and system," etc.

It will thus be seen the management of the water system is here vested in the council, instead of in the city manager, as is provided by section 44 as to all the other bureaus and departments of the city.

In view of the provisions of sections 68 and 69, it is strange that the water system of the city should not have been specifically exempted from the supervision and control of the city manager, in the same way that the educational department is, but we must take the situation as we find it and determine the merits of this action accordingly; otherwise we would fail to give proper force and effect to the plain reading of sections 68, 69, and 70.

It is urged by the defendants: That it was the clear purpose and intention of the framers of the charter, and of the Legislature in pass-

ing it, to reserve to the council the supervision and management of the water supply system of the city; and, in support of this contention, the court's attention is called to the fact that, under the prior charter of the city in force before the city voted to adopt the commission form of government, the management and control of the water system was vested in a board of water commissioners. That by the charter the city had a department of public works, but its jurisdiction did not extend to the water system. That, when the present charter was drafted, the separation of the department or bureau of water was continued; the duties of the board of public service being given the city manager, while those formerly belonging to the water commissioners were given to the council itself. Anyway, subdivision 1 of section 68 follows the language of section 591 of the old charter, saving that the words "the council" are substituted for those of "the board of water commissioners," and the new provision omits the following words contained in the former section at the end of subdivision 1:

"Provided, however, that no such bonds shall be issued or sold until the issuance thereof has been authorized by the board of estimate and apportionment and by the common council."

We are forced, therefore, to the conclusion that, notwithstanding the broad language used in section 44 touching the powers, duties, and authority of the city manager, he possesses no power or authority over the department of water, except such as may have been given or delegated to him by the council as their agent and representative. It follows therefore that the duty imposed by section 44 on the city manager, subdivision 7, to present "a written statement of any public improvement or betterment" to the city council, has no application to improvements, extensions, enlargements, or alterations proposed to be made by the council in the water supply system of the city; but the council may act in that matter on its own initiative, and independent of any recommendation or statement by the city manager.

I think, too, it follows that the requirements of section 125, that the statements and recommendations of the city manager shall first be submitted to the resident taxpayers, relates only to those recommendations and statements the city manager is required to make under section 44, and does not relate to contemplated improvements or betterments to the water supply system of the city.

Again, referring to section 125 of the new charter, we find it corresponds to section 222 of the former charter, and was evidently copied therefrom, and the old section related solely to recommendations and statements made by the former board of public works, to whose duties the city manager succeeds. The fact therefore that the city manager did in fact recommend the laying of the additional water main in this case, and the city council acted on his recommendations and statement, cannot, in our judgment, be deemed controlling in this case, or derogate from the authority of the city council to act without, or independent of, any such statement or recommendation. In law, such statement of the city manager neither added to nor took away any authority conferred by section 68 of the present charter.

[4] The question, however, still remains whether section 68 in fact confers any authority on the city council to issue bonds to raise funds to pay for the cost of construction of a new main as contemplated.

The plaintiff urges that the power conferred to issue and sell bonds is confined to the issuance of bonds for the purpose of constructing, maintaining, and operating a power plant for developing and generating electrical or other power for the operation of the waterworks plant and system. Attention is called to the fact that after and at the end of the grant of power "to improve, extend, enlarge, alter and repair said waterworks plant and system, and the water mains, pipes and machinery, and apparatus connected therewith and appurtenant thereto;" there is a semicolon. It is claimed that what follows in the section constitutes an entirely independent proposition, and the authority to issue bonds is confined to matters and projects embraced in the latter part of the section, and confers no power to issue bonds for ordinary improvements, extensions, alterations and repairs; that for such things the council can only use the available funds on hand, and cannot resort to a bond issue. As a matter of punctuation, the contention has force. If, instead of a semicolon, a period had been used, I think there would have been no question as to the correctness of the plaintiff's contention. If, on the other hand, a comma had been inserted where the semicolon appears, then we think there could be no question but that the right to issue bonds related to all the matters embraced in section 68. But, being as we find it, the question is whether the mere punctuation is controlling.

In the case of Matter of Meyer, 209 N. Y. 389, 103 N. E. 714, L. R. A. 1915C, 615, Ann. Cas. 1915A. 263, the Court of Appeals said:

"It is always presumed, in regard to a statute, that no unjust or unreasonable result was intended by the Legislature. Hence if, viewing a statute from the standpoint of the literal sense of its language, it works such a result, an obscurity of meaning exists, calling for judicial construction. Where a particular application of a statute in accordance with its apparent intention will occasion great inconvenience or produce inequality or injustice, another and more reasonable interpretation is to be sought. Holy Trinity Church v. United States, 143 U. S. 457 [12 Sup. Ct. 511, 36 L. Ed. 226]; Murray v. N. Y. C. R. R. Co., *43 N. Y. 274; People ex rel. Wood v. Lacombe, 99 N. Y. 43 [1 N. E. 599]; Murray v. Gibson, 15 How. (U. S.) 421 [14 L. Ed. 755]; State ex rel. Heiden v. Ryan, 99 Wis. 123 [74 N. W. 544]. The courts must in that event look to the act as a whole, to the subject with which it deals, to the reason and spirit of the enactment, and thereby determine the true legislative intention and purpose; and, if such purpose is reasonably within the scope of the language used, it must be taken to be a part of the statute the same as if it were plainly expressed."

In People ex rel. Wood v. Lacombe, 99 N. Y. 49, 1 N. E. 600, the court said:

"In the interpretation of statutes, the great principle which is to control is the intention of the Legislature in passing the same, which intention is to be ascertained from the cause or necessity of making the statute, as well as other circumstances. A strict and literal [literary] interpretation is not always to be adhered to, and, where the case is brought within the intention of the makers of the statute, it is within the statute, although by a technical interpretation it is not within its letter. It is the spirit and purpose of a statute which are to be regarded in its interpretation; and, if these find fair expression in the statute, it should be so construed as to carry out the legisla-

tive intent, even although such construction is contrary to the literal mean-ing of some provisions of the statute."

In matters of punctuation it was said in Chicago, M. & St. P. R. R. Co. v. Voelker, 129 Fed. 522, 527, 65 C. C. A. 226, 70 L. R. A. 264:

"Punctuation is a minor, and not a controlling, element in interpretation, and courts will. disregard the punctuation of a statute, or repunctuate it, if need be, to give effect to what otherwise appears to be its * * * true meaning"—citing Hammock v. Loan & Trust Co., 105 U. S. 77–84, 26 L. Ed. 1111; U. S. v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; U. S. v. Oregon, etc., R. Co., 164 U. S. 526, 17 Sup. Ct. 165, 41 L. Ed. 541; Stephens v. Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041.

We cannot think it was the intention of the framers of the charter of the city, or of the Legislature, to withhold from the city the power to issue bonds for an improvement of the kind now under consideration; and, if the authority to do so cannot be found in section 68, we are unable to find it expressly given in any other section or paragraph of the charter. It cannot be presumed that the city would have on hand sufficient funds available for any such purposes. It would be very unusual, and contrary to the ordinary experience of such municipalities, if sufficient available money could be realized from the surplus earnings of a water supply system to make such an expensive addition. We cannot suppose it was the intention that the city should be helpless and unable to act where the necessities of the case demanded action.

It will be noted, too, that the language of section 68 reads, "and if sufficient money shall not be available for such purposes," bonds may be sold. There is apparently but one purpose specified in what immediately precedes, and when the plural is used we think it fairly shows that the word refers to all the things specified in the entire subdivision—that is, to improvements, extensions, enlargements, and alterations generally—and that the section should be so construed.

If we are right in this view of the case, then the injunction asked for should be denied, and the temporary restraining order dissolved.

It is so ordered, with $10 costs of the motion to the defendants.