*Ex parte* L. K. HUNNICUTT.

*Ex parte* C. H. PATTON.

Nos. A-1461, A-1565. Opinion Filed April 20, 1912.

(123 Pac. 179.)

1. CONSTITUTIONAL LAW — Statutes — Presumption in Favor of Constitutionality. Every presumption must be indulged in favor of the constitutionality of an act of the Legislature; and courts will not declare any law unconstitutional, unless they find that it is irreconcilable with the Constitution. State v. Coyle et al., ante, 122 Pac. 243, approved and reaffirmed.

2. SAME. Where a statute is subject to two constructions, one conforming to and the other contravening the Constitution, courts will adopt that construction which conforms to the Constitution.

3. STATUTES — Construction — Punctuation and Grammatical Construction. In construing a statute, courts are not bound by punctuation or the grammatical construction of sentences. The object of construction is, if possible, to give effect and purpose to the true meaning of the statute.

4.    **SAME — General Rules — Intention.**  The fundamental rule of construction is to ascertain the intention of the law-makers, in order that the true meaning of the Legislature may be determined.  To accomplish this purpose, all parts of an act relating to the same subject should be considered together.  A later clause or provision may qualify an earlier one; and the converse is equally true.  **Ex parte Whitehouse,** 3 Okla. Cr. 103, 104 Pac. 372, approved and reaffirmed.

5.    **INTOXICATING LIQUORS — Offenses — "Imitation" — "Substitute."**  To sell, give away, barter, or otherwise furnish an "imitation" or "substitute" for malt liquor does not constitute an offense against the laws of Oklahoma, unless such imitation or substitute contains as much as one-half of one per centum of alcohol, measured by volume.

6.    **SAME — Criminal Prosecutions — Indictment and Information.**  Where a defendant is charged with selling, giving away, bartering, or otherwise furnishing an imitation of or substitute for liquors prohibited by the laws of Oklahoma, the information or indictment must go further and allege that such imitation or substitute contained as much as one-half of one per cent. of alcohol, measured by volume, or it will not charge an offense against the laws of the state of Oklahoma.

7.    **INDICTMENT AND INFORMATION—Requisites of Accusation —Conclusions or Matters of Fact.**  Under the Constitution of this state, it is necessary for an information or indictment to state the ultimate facts necessary to constitute an offense.  Allegations of conclusions of law and of the opinions of the pleader will not charge an offense against the law.

(Syllabus by the Court.)

Applications by L. K. Hunnicutt and C. H. Patton, respectively, for writs of *habeas corpus.*  Writs issued, and petitioners discharged from custody.

On the 2d day of November, 1911, the petitioner L. K. Hunnicutt filed a petition for a writ of *habeas corpus* in this court, in which he alleged that he was in the custody of the sheriff of Bryan county, under and by virtue of a prosecution pending in the county court of said county, based upon a certain information filed in said court, the charging part of which is as follows:

"That is to say, the said defendant did, in said county and state, at the date above named, unlawfully barter, sell, give away, and otherwise furnish hop ale, the said hop ale being an imitation and substitute for malt liquor, to one W. C. Waldon."

On the 2d day of January, 1912, the petitioner C. H. Patton filed a petition for a writ of *habeas corpus* in this court,

wherein he alleged that he was imprisoned in the county jail of Creek county, under and by virtue of a prosecution pending in the county court of said county, based upon an information filed in said court, the charging part of which is as follows:

"That said defendant, C. H. Patton, did, in said county and state aforesaid, and on the date aforesaid, unlawfully barter, sell,. give away, and otherwise furnish to one Frank Denny one bottle· of Tonine; said Tonine being an imitation of and substitute for malt liquor, and containing (.15) fifteen hundredths per cent. of alcohol, measured by volume."

*D. A. Richardson,,* for petitioner L. K. Hunnicutt. *Stuart, Cruce & Gilbert,* for petitioner C. H. Patton.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above). Both of these cases present the same question, and therefore can be decided in the same opinion. The question is as to whether an information or indictment which alleges that the defendant sold, bartered, gave away, and otherwise furnished an imitation of or substitute for spirituous, vinous, fermented, or malt liquors charges an offense against the laws of the state of Oklahoma.

The petitioners contend that this provision of the statute is so indefinite and uncertain as to be indeterminable, invalid, and void, because it fails to declare what shall be an imitation of or substitute for the liquors named, and that, in the absence of some legal definition of the general terms "imitation" and "substitute," there is no legal standard or guide by which a citizen may regulate his actions in this respect, and that there is no definite standard for the court in its instructions to the jury; that there is no certain guide for the jury in their deliberations; and therefore there is nothing by which either certainty or uniformity in the enforcement of this provision can be secured.

This is the first time that this question has been directly submitted to this court for decision; and, while it is true that the matter has been referred to in several of the opinions of this court, yet the objections now urged were not argued or submitted to or

considered by the court in any of its former opinions. See *Moss v. State,* 4 Okla. Cr. 247, 111 Pac. 950; *Lightle v. State,* 5 Okla. Cr. 259, 114 Pac. 275. What has heretofore been said on this subject has been by way of illustration, and cannot be considered as in any manner decisive of this question. No reputable court will consider any question as being settled by anything said in a decision, unless that question was either directly submitted or was necessarily involved in the issues argued, submitted, and passed upon in such decision. It is therefore our duty to treat this as a question of first impression, to be decided upon its merits alone, without reference to anything which has heretofore been said. We will endeavor to give this matter that impartial, thorough, and careful investigation which its importance demands. This will involve a construction of section 4180, Comp. Laws 1909, which is as follows:

"It shall be unlawful for any person, individual or corporate, to manufacture, sell, barter, give away, or otherwise furnish, except as in this act provided, any spirituous, vinous, fermented or malt liquors, or any imitation thereof or substitute therefor; or to manufacture, sell, barter, give away, or otherwise furnish any liquors or compounds of any kind or description whatsoever, whether medicated or not, which contain as much as one-half of one per centum of alcohol, measured by volume, and which is capable of being used as a beverage, except preparations compounded by any licensed pharmacist, the sale of which would not subject him to the payment of the special tax required by the laws of the United States; or to ship or in any manner convey such liquor from one place within this state to another place therein except the conveyance of a lawful purchase as herein authorized; or to solicit the purchase or sale of any such liquors, either in person or by sign, circular, letter, card, price list, advertisement or otherwise, or to distribute, publish or display any advertisement, sign or notice where any such liquor may be manufactured, bartered, sold, given away, or otherwise furnished, or to have the possession of any such liquors with the intention of violating any of the provisions of this act. A violation of any provisions of this act shall be a misdemeanor, and shall be punished by a fine of not less than fifty dollars nor more than five hundred dollars and by imprisonment for not less than thirty days, nor more than six months; provided, however, that the provisions of this act

shall not apply to the manufacture and sale of unfermented cider, and wine made from apples, grapes, berries or other fruit grown in this state, and to the use of wine for sacramental purposes in religious bodies."

If the statute had stopped with the declaration that it was unlawful for any person, individual, or corporation to manufacture, barter, sell, give away, or otherwise furnish any imitation of or substitute for the liquors therein mentioned, we think that the objections now urged by counsel for petitioners would be fatal to this provision. The terms "imitation" and "substitute" have no definite legal meaning, and are so general and indefinite in their import that it would be impossible for either a court or jury, except as their own individual opinions might apply, to say what properties an imitation of or substitute for the liquors therein mentioned should contain. The court and jury would be altogether without a fixed standard to determine what it would take to constitute an imitation of or substitute for the prohibited liquors. The fact that an alleged imitation or substitute might look like alcohol, gin, or champagne could not determine this matter, because, if this were true, then the sale or giving away of water might constitute an offense, because one might mistake it in a bottle or glass for alcohol, gin, or champagne. Coffee has the color of and looks like porter. Ice tea and vinegar have the color of and look like whisky, beer, or ale. Grape juice has the color of and looks like wine, and has every attribute of wine, except fermentation. The decisions with reference to counterfeiting, which consists in making something which looks like that of which it is a counterfeit, cannot be invoked. To make valid an act forbidding the selling or giving away of imitations of or substitutes for prohibited liquors, the Legislature must go further and so define and limit the terms "imitation" and "substitute" as to restrict them in their meaning to those beverages which contain the harmful properties of the prohibited liquors, or of which a deceptive use is made, or is intended to be made. As is well said by Judge Richardson, in his brief for petitioner Hunnicutt:

"Let us examine the crucial words in this provision, 'imitation' and 'substitute,' and see what they mean. They are each words of no fixed or determinable signification. They are not legal terms. They had no fixed meaning at common law. They are not defined by this or any other provisions of our statutes. They are only general words of general and indeterminable meaning. Let us consider the word 'substitute' first. It is made an offense for any person to manufacture, barter, sell, or give away any 'substitute' for spirituous, vinous, fermented, or malt liquors. The general definition of 'substitute,' and that is the only definition we have here, is a thing which takes the place of or is used instead of another. It is not necessary that it bear any likeness or resemblance to the other. Now, according to all the authorities, spirituous, vinous, fermented, and malt liquors are intoxicating. See definition of these terms in Woolen & Thornton's Law of Intoxicating Liquors. Is it necessary that the substitute contain any alcohol? When a laborer and his family residing in some eastern city, where they habitually drink beer with their meals, move to Oklahoma, where they cannot get beer, and they drink buttermilk here in the place and stead of beer, and for the sole reason that they cannot get beer, is not buttermilk then a substitute for a malt liquor? And would not any liquid which this family might choose to drink instead of beer be a substitute under such circumstances? If a person who has a taste for wine cannot get wine, and he drinks grape juice instead, is grape juice then a substitute, and has the dealer who sold it violated the law? And can you possibly imagine a substitute for spirituous liquor? Is the Keeley cure a substitute for intoxicating liquor? And if a person chews gum, because he is out of chewing tobacco, would the dealer who furnished it violate the law, if it forbade the sale of any substitute for tobacco? What is a substitute for any of these prohibited liquors? And bear in mind that a substitute is merely a thing put or used in the place and stead of another. It need not bear any resemblance to the other. Must it produce the effect produced by the other? Imagine the county attorney informing the court, by information, that on the 1st day of January, 1911, the defendant 'did unlawfully give to John Jones one pint of a substitute for malt liquor, the name of said substitute being to your informant unknown.' What luminous charge this would be, and how thoroughly it would inform the defendant of the nature and cause of the accusation against him! When gasoline is used in the place of alcohol for fuel or motive power, has the dealer who sold the gasoline violated the law? And what

properties must a thing have, in order to be a substitute? Who is going to determine what constitutes a substitute, and how is he going to determine it? What is the guide, what is the standard?

"An 'imitation' is a thing that bears a likeness or resemblance to another thing. That is to say, an imitation must have some, but not all, of the attributes of the genuine thing. If it had all the attributes, it would be the genuine thing itself. What attributes must a thing have to be an imitation of malt liquor, and how many and what particular attributes must they be. The attributes of beer are its color, its taste, its intoxicating properties, its odor, the method of its manufacture, the fact that it is malted, the grain from which it is made, etc. In order that a liquid be an imitation of beer, how many and which particular attributes must it have in common with beer? Who is going to determine this question, and how is he going to determine it? What is his guide, what must be his standard? Is it sufficient that it so looks like beer that its appearance might deceive one? If so, then must not that resemblance be intentional and not accidental? And are root beer and iced tea an imitation of beer? Is grape juice an imitation of wine? Is lemonade an imitation of gine or alcohol? To be an imitation, must it contain any alcohol? Must it taste like the genuine? Must it smell like the genuine? Must it have any certain one, any certain two, any certain three, of the attributes of the genuine? And if so, which one, two, or three of those attributes must it have? Who is going to determine that question? The jury? The law ought to be definite and certain enough for the individual to tell before he makes or sells the article. And how can the jury tell? What is their guide? Where will be the uniformity in the administration and enforcement of the law?"

In the case of *United States v. Reese*, 92 U. S. 214, 23 L. Ed. 563, Chief Justice White said:

"Penal statutes ought not to be expressed in language so uncertain. If the Legislature undertakes to define by statute a new offense, and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime."

And, again, he said:

"The question to be determined is whether we [that is, the courts] can introduce words of limitation into a penal statute, so as to make it specific, when, as expressed, it is general only. It

would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step aside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government. * * * To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty."

In the case of *Czarra v. Board of Medical Supervisors,* 25 App. D. C. 443, Chief Justice Shepard said:

"In all criminal prosecutions, the right of the accused to be informed of the nature and cause of the accusation against him is preserved by the sixth amendment. In order that he may be so informed by the indictment or information presented against him, the first and fundamental requisite is that the crime or offense with which he stands charged shall be defined with reasonable precision. He must be informed by the law, as well as by the complaint, what acts or conduct are prohibited and made punishable. In the exercise of its power to regulate the conduct of the citizens, within the constitutional limitations, and to declare what shall constitute a crime or punishable offense, the Legislature must inform him with reasonable precision what acts are intended to be prohibited. * * * This obvious duty must be performed by the Legislature itself, and cannot be delegated to the judiciary. It may doubtless be accomplished by the use of words and terms of settled meaning, or which indicate offenses well known to and defined by the common law. Reasonable certainty, in view of the conditions, is all that is required; and liberal effect is always to be given to the legislative intent, when possible. But when the Legislature declares an offense in words of no determinate signification, or its language is so general and indefinite as that it may embrace within its comprehension, not only acts commonly regarded reprehensible, but others also, which it is unreasonable to presume were intended to be made criminal, the courts, possessing no arbitrary discretion to discriminate between those which were and those which were not intended to be made unlawful, can do nothing else than declare the statute void for its uncertainty."

And again:

"Unprofessional or dishonorable conduct, for which the statute authorizes the revocation of a license that has been regularly issued, is not defined by the common law, and the words have

no common or generally accepted signification. What conduct may be of either kind remains, as before, a mere matter of opinion. In the absence of some specification of acts by the law-making power, which is alone authorized to establish the standard of honor to be observed by persons who are permitted to practice the profession of medicine, it must, in respect to some acts at least, remain a varying one, shifting with the opinions that may prevail from time to time in the several tribunals that may be called upon to interpret and enforce the law."

And again:

"The underlying question involved in all cases that may arise is whether the courts can uphold and enforce a statute whose broad and indefinite language may apply, not only to a particular act, about which there would be little or no difference of opinion, but equally to others, about which there might be radical differences, thereby devolving upon the tribunals charged with the enforcement of the law the exercise of an arbitrary power of discriminating between the several classes of acts."

These two decisions are in harmony with the overwhelming weight of authority, and, in our judgment, are founded upon justice and supported by reason. They are also directly applicable to section 20 of article 2 of the Constitution of this state, which, in express terms, among other things, declares that the accused "shall be informed of the nature and cause of the accusation against him and have a copy thereof, and be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his behalf." These just and humane provisions of the Constitution were intended to enable persons charged with crime to prepare for trial. It requires no argument to demonstrate that a defendant cannot safely prepare for trial, unless he is informed of the ultimate facts which will be proven against him. This cannot be done if those ultimate facts depend upon the personal opinion of the trial judge or jurors. The Constitution is the supreme law of the state. It is legislation direct from the people, acting in their sovereign capacity; while a statute enacted by the Legislature is legislation from the representatives of the people, subject to the limitations prescribed in the Constitution by the sovereign authority. Unless the fixed principles of free government are clearly stated in the Constitution,

and the exercise of power by the different departments of the state are strictly limited and controlled by these constitutional provisions, our state government would be like a ship without a rudder or compass, and would drift and be driven hither and thither by every passing wind or wave. Hence the necessity of a Constitution and the duty of the courts to enforce it as the supreme law, subject only to the Constitution of the United States. Any act of the Legislature which interferes with or deprives a party charged with crime of a single right guaranteed to him by the Constitution is, to this extent, unconstitutional; and it is the duty of the courts when they find that an irreconcilable conflict exists between an act of the Legislature and the Constitution of the state, to declare that such act is unconstitutional and void, and thereby vindicate the supremacy of the Constitution. But this should only be done where such conflict is clearly irreconcilable. Every presumption must be indulged in favor of the constitutionality of an act of the Legislature. See *State v. Coyle, ante,* 122 Pac. 243.

Where a statute is subject to two constructions, one conforming to and the other contravening the Constitution, that construction which conforms to the Constitution must be adopted. See *Robson v. Doyle,* 191 Ill. 566, 61 N. E. 435; *Ivy v. State,* 112 Ga. 175, 37 S. E. 398; *State v. Capdeville,* 104 La. 561, 29 South. 215. It is the duty of the courts, whenever it is possible to do so, to harmonize acts of the Legislature with the Constitution, so that they both can be sustained. *French v. Teschemaker,* 24 Cal. 518; *People v. Peacock,* 98 Ill. 172; *Hovey v. State,* 119 Ind. 395, 21 N. E. 21; *McComas v. Krug.* 81 Ind. 327, 42 Am. Rep. 135; *Maize v. State,* 4 Ind. 342; *Cherokee County v. State,* 36 Kan. 337, 13 Pac. 558; *Conner v. Commonwealth,* 13 Bush (Ky.) 714; *Grand Rapids Booming Co. v. Jarvis,* 30 Mich. 308; *Tabor v. Cook,* 15 Mich. 322; *Marshall v. Grimes,* 41 Miss. 27; *McGwigan v. Wilmington, etc., R. Co.,* 95 N. C. 428, 59 Am. Rep. 247; *Granville Co. v. Ballard,* 69 N. C. 18; *Portland, etc., R. Co. v. Portland,* 14 Ore. 188, 12 Pac. 265, 58 Am. Rep. 299.

In construing a statute, courts are not bound by punctuation or the grammatical construction of the sentences. The object of construction is, if possible, to give effect to the purpose and true meaning of the statute.

Our views on this subject were clearly and forcibly expressed by Judge Owen, in *Ex parte Whitehouse,* 3 Okla. Cr. 103, 104 Pac. 374. He there said:

"As early as the case of *Ogden v. Saunders,* 12 Wheat. 267, 6 L. Ed. 606, decided January, 1827, the Supreme Court of the United States held that the derangement of words and even sentences of the law might be tolerated, in order to arrive at the apparent meaning of the Legislature, to be gathered from other parts and from the entire scope of the law. In the case of *Werckmeister v. Pierce* [C. C.] 63 Fed. 445, the United States Circuit Court held that rearrangement of clauses or parts of sentences is justifiable under the most common circumstances, and is especially justifiable in order that the statute may not be read contrary to its plain purpose and the general public policy. In construing constitutions, the same rules must govern that govern in construing statutes. The Constitution is the supreme law of the land, and it differs from an act of the Legislature in having been adopted by the whole people. * * * We are not without authority to ignore the punctuation and to construe the section as we believe it should have been punctuated. It is commonly stated that 'punctuation is no part of the statute,' and that 'for the purpose of arriving at the true meaning of the statute courts read with such stops as are manifestly required.' *United States v. Lacher,* 134 U. S. 628, 10 Sup. Ct. 626 (33 L. Ed. 1080); *Stephens v. Cherokee Nation,* 174 U. S. 480, 19 Sup. Ct. 722, 43 L. Ed. 1041; *U. S. v. Oregon R. Co.,* 164 U. S. 541, 17 Sup. Ct. 165, 41 L. Ed. 541; *Ford v. Delta Land Co.,* 164 U. S. 674, 17 Sup. Ct. 230, 41 L. Ed. 590. In the construction of the laws, punctuation is no criterion of the sense of the Legislature, unless it is in conformity with their intention as appears in the words they use. Punctuation is generally the act of the clerk or printer, which the court will disregard, if, taking the instrument by its four corners, and looking at all its provisions, a judicial construction points to an intention different from what the mere punctuation indicates. This rule was observed in the case of *Durousseau v. United States,* 6 Cranch, 307, 3 L. Ed. 232, and in the case of *In re Irwine,* Fed. Cas. No. 7,086."

Judge Owen's opinion is not only an able exposition of the law, but a careful reading of it will show that it is conclusively fortified by the authorities.

As was said in the case of *Chicago, Milwaukee & St. Paul Ry. Co. v. Voelker,* 129 Fed. 527, 65 C. C. A. 231, 70 L. R. A. 264:

"Punctuation is a minor, and not a controlling, element in interpretation, and courts will disregard the punctuation of a statute, or repunctuate it, if need be, to give effect to what otherwise appears to be its purpose and true meaning. *Hammock v. Loan & Trust Co.,* 105 U. S. 77, 84, 26 L. Ed. 1111; *United States v. Oregon, etc., Railroad,* 164 U. S. 526, 541, 17 Sup. Ct. 165, 41 L. Ed. 590; *Stephens v. Cherokee Nation,* 174 U. S. 445, 480, 19 Sup. Ct. 722, 43 L. Ed. 1041; Sutherland, Statutory Construction, sec. 232."

In the case of *Union Refrigerator Transit Co. v. Lynch,* 48 L. R. 790, the court said:

"The question of punctuation cannot be allowed to control in the construction of these provisions of the statute against, as we think, the manifest intent of the Legislature. It would be a most fallible standard by which to construe them. In the interpretation of statutes, the true meaning of the lawmaker must be ascertained from the whole purview; and when that is manifest from a judicial inspection the court will not permit punctuation to change it. To ascertain the real intention and meaning of the statute, the court will punctuate, or disregard punctuation, as may be necessary. Punctuation may, when the meaning is uncertain, furnish some indication of it, and in such case may even decide what the meaning is; but, when the intention of the Legislature is apparent from a reading of the statute, such intention must prevail, regardless of punctuation. Sutherland on Stat. Constru. sec. 232."

The fundamental rule of construction is to ascertain the intention of the lawmakers, in order that the true meaning of the Legislature may be determined. Every word and provision of an act must be considered. See *Eddy v. People,* 118 Ill. App. 138. Endlich on the Interpretation of Statutes states the law on this subject as follows:

"Passing from the external history of the statute to its contents, it is an elementary rule that construction is to be made of all

7 Cr.—7

the parts together, and not of one part only by itself. '*Incivile est, nisi tota lege perspecta, una aliqua particula, ejus proposita, judicare, vel respondere.*' '*Ex antecedentibus et consequentibus fit optima interpretatio.*' A survey of the entire statute is almost always indispensable, even when the words are the plainest; for the true meaning of any passage is that which best harmonizes with the subject, and with every other passage of the statute."

Lewis' Sutherland, Statutory Construction (2d Ed.) vol. 2, p. 659, states the law on this subject as follows:

"It is to be presumed that all the subsidiary provisions of an act harmonize with each other, and with the purpose of the law; if the act is intended to embrace several objects, that they do not conflict. Therefore it is an elementary rule of construction that all the parts of an act relating to the same subject should be considered together, and not each by itself. By such a reading and consideration of a statute, its object or general intent is sought for, and the consistent auxiliary effect of each individual part. Flexible language, which may be used in a restricted or extensive sense, will be construed to make it consistent with the purpose of the act and the intended modes of its operation, as indicated by such general intent, survey, and comparison. '*Ex antecedentibus et consequentibus fit optima interpretatio.*' The order in which the provisions occur in a statute is immaterial, where the meaning is plain, and there is not a total conflict. A later clause or provision may qualify an earlier one; and the converse is equally true."

This is not only the settled law in America, but it has been the law of England since the days of Lord Coke. Coke's Littleton, vol. 2, p. 381a, states the law as follows:

"It is the most natural and genuine exposition of a statute to construe one part of the statute by another part of the same statute, for that best expresseth the meaning of the makers."

We regard these rules of statutory construction as being absolutely just and sound, and will not consume more time and space by quoting additional authorities supporting them. Applying these rules to the statute under consideration, as the words "imitation" and "substitute" have not in themselves a common-law meaning, or any fixed and definite legal meaning, and are general, and might include many things which are innocent and harmless in themselves, we must examine the entire statute and

see if it does not contain other provisions which limit and give a definite legal meaning to the words "imitation" and "substitute," as used in this statute, and thereby establish what constitutes unlawful imitations and substitutes of prohibited liquors. Immediately following the words "imitation" and "substitute," the statute further says:

"Or to manufacture, sell, barter, give away, or otherwise furnish any liquors or compounds of any kind or description whatsoever, whether medicated or not, which contain as much as one-half of one per centum of alcohol, measured by volume, and which is capable of being used as a beverage."

We think it clear that it was the intention of the Legislature that section 4180 of the Comp. Laws of 1909, hereinbefore quoted, should be construed as a whole, and all of its parts together. In fact, this must be done, or the subsequent provision would be entirely idle and meaningless; for it does not make it unlawful for any person, individual or corporate, to do any of the things mentioned in said clause. Before this provision can stand, it must be construed in connection with the paragraph which immediately precedes it; and that which immediately precedes it must be construed in connection with the portion of the statute last quoted. The entire section must be considered when construing each of its provisions; otherwise we would be forced to hold nine-tenths of this section invalid. We are therefore of the opinion that the words "which contain as much as one-half of one per centum of alcohol, measured by volume," are a limitation upon and give a fixed and definite legal meaning to the words "imitation" and "substitute," and that it is the presence of one-half of one per centum of alcohol which makes such substitutes and imitations unlawful. This gives the courts and juries a definite standard to go by in such cases, and takes the law entirely out of the realm of uncertainty.

From reading the entire statute, it clearly appears to be the purpose of the Legislature to prohibit the manufacture, sale, barter, giving away, or otherwise furnishing of any intoxicating liquors, or any substitute or imitation thereof which contain the elements of intoxication to such an extent as would make the use

of such substitutes or imitations harmful or dangerous. The statute does not leave this to conjecture, but goes further and establishes one-half of one per centum of alcohol, measured by volume, as the amount of the intoxicating element which would make the use of such substitutes or imitations unlawful. It is a fact, generally known in this jurisdiction, and of which the court will therefore take judicial notice, that since the establishment of prohibition a number of people in this state habitually use coffee as a substitute for prohibited liquors. This fact is susceptible of being proven by legal evidence. Who would be bold enough to say that the use of coffee as a substitute for prohibited liquors comes within the meaning of the statute, and would constitute an offense against the law? Such a construction would be to reduce the law to an absurdity. Other illustrations could be made, but this alone is enough to show that, where an information or indictment merely charges a defendant with unlawfully handling any substitute for or imitation of prohibited liquors, it would not charge an offense against the laws of the state of Oklahoma. Where an information or indictment charges the unlawful use of imitations of or substitutes for prohibited liquors, without going further and alleging facts which would bring them within the purpose of the law, such information or indictment simply charges that, in the opinion of the pleader, an offense has been committed. This would be contrary to the universal rule that legal accusations must allege facts, not opinions.

We therefore hold that the information in both cases now being considered simply states the conclusions and opinions of the pleader, and does not charge any facts which constitute a violation of the laws of Oklahoma. Writs of *habeas corpus* will issue in both of said cases; and it is ordered that the petitioners in both cases be discharged from custody.

ARMSTRONG and DOYLE, JJ., concur.