BULOVA WATCH CO. *v.* UNITED STATES (No. 3608)[1]

---

[1] T. D. 46494.

United States Court of Customs and Patent Appeals, May 22, 1933

*Lamb & Lerch (John G. Lerch* of counsel) for appellant.
*Charles D. Lawrence,* Assistant Attorney General (*Daniel P. McDonald,* special attorney, of counsel), for the United States.
*Barnes, Richardson & Halstead (Samuel M. Richardson* of counsel), *amicus curiae.*

[Oral argument April 5, 1933, Mr. Lerch, Mr. Richardson, and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associated Judges

LENROOT, Judge, delivered the opinion of the court:

Appellant in November, 1931, imported at the port of New York 12 watch movements, each having seven jewels and eight mechanical devices or parts, technically known as "bouchons" or "bushings." The movements were classified by the collector and duty thereon was assessed at the rate of $2.95 each as watch movements under the following provisions of paragraph 367 of the Tariff Act of 1930:

PAR. 367. (a) Watch movements, and time-keeping, time-measuring, or time-indicating mechanisms, devices, and instruments, whether or not designed to be worn or carried on or about the person, all the foregoing, if less than one and seventy-seven one-hundredths inches wide, whether or not in cases, containers, or housings:

(1) If more than one and one-half inches wide, $1.25 each; if more than one and two-tenths inches but not more than one and one-half inches wide, $1.40 each; if more than one inch but not more than one and two-tenths inches wide, $1.55 each; if more than nine-tenths of one inch but not more than one inch wide, $1.75 each; if more than eight-tenths of one inch but not more than nine-tenths of one inch wide, $2 each; if more than six-tenths of one inch but not more than eight-tenths of one inch wide, $2.25 each; if six-tenths of one inch or less wide, $2.50 each;

\*     \*     \*     \*     \*     \*     \*

(3) any of the foregoing having more than seven jewels shall be subject to an additional duty of 15 cents for each jewel in excess of seven;

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(i) For the purposes of this paragraph and paragraph 368 the term "jewel" includes substitutes for jewels.

In assessing said watch movements with duty, the collector held that said bouchons or bushings, hereinafter called bushings, were substitutes for jewels and therefore, under the provisions of said paragraph, should be regarded for tariff purposes as jewels.

There was no marking upon the movements stating that they contained eight substitute jewels, and the collector, holding that said paragraph 367 required such marking, declined to deliver them to appellant until they were so marked.

Appellant protested the classification made by the collector and the assessment for duty upon the movements, claiming them to be dutiable under said paragraph 367 at $1.75 each; that there were no "substitutes for jewels" in the merchandise, and therefore the provisions of subdivision (3) of said paragraph 367 (a) are not applicable to the merchandise involved.

Another ground of protest was the claim that the requirement of the collector with respect to the markings to indicate the presence of eight substitute jewels was unlawful and illegal.

It appears that thereafter appellant did mark the movements as required by the collector and thereupon the merchandise was delivered to it.

Upon the trial in the lower court, voluminous testimony was taken for both parties, and samples of the movements involved were placed in evidence.

The lower court held that said bushings were "substitutes for jewels" within the meaning of said paragraph 367, and with respect to said marking required by the collector it held that, the movements having been marked as demanded by the collector, and appellant having received delivery of the goods, the question of whether such demand of the collector was unlawful and illegal had become moot, and therefore would not be decided.

Judgment overruling appellant's protest was entered accordingly, and from such judgment this appeal is taken.

With respect to the question of unlawful marking, the lower court was unquestionably correct in holding that by appellant's action the question had become moot; but in any event the conclusion which we have reached with respect to the proper classification of said watch movements renders further discussion of this point unnecessary.

The crucial question in the case is whether the eight bushings found in each of the movements here involved are "substitutes for jewels," within the meaning of those words as used in said paragraph 367.

The lower court in its decision said:

The record is voluminous, but there is little disagreement therein as to the essential facts. Therefore, irrespective of the question of alleged illegal marking, we find from the uncontradicted testimony (1) that watch jewels are removable frictional bearings; (2) that in cheap watch movements these metal bouchons or bushings serve as bearings instead of jewels; (3) that the functions of each are precisely the same in that each is removable, each has provision for lubrication and for taking up the "end shake," and each operates to make the watch movement more readily adjustable; and (4) that the sole difference between the two classes of articles is that the jewels are more durable.

We are inclined to agree with the foregoing four findings of the lower court, construing the third finding as not stating all the functions of a jewel but only those which are similar to the functions of a bushing, but we are of the opinion that one additional fact should be considered, a fact not contradicted in the testimony, and of which we may take judicial notice by reason of its being a matter of common knowledge, and that is that the only reason that a jewel is ever used in a watch movement in preference to a pivot bearing of metal is because of the hardness of the jewel and the smaller amount of friction encountered in its use.

The lower court, after stating its findings as above set out, said:

Hence, since these metal bouchons or bushings actually take the place of jewels and perform all the functions thereof, they are "substitutes" for jewels, giving to that word its common and ordinary meaning. Such bouchons or bushings are therefore jewels as expressly provided for in said subdivision (i), and we so hold.

With this conclusion of the lower court we are unable to agree, for the reasons hereinafter stated.

Both appellant and the Government produced witnesses highly expert in the art of watch making, As stated by the lower court, there is little disagreement in the testimony as to the essential facts, and for the most part such testimony must be regarded merely as an aid to the court in determining the meaning of the words "jewels" and "substitutes for jewels," as those words are used in said paragraph 367.

The word "jewel" as applied to watch movements is defined in standard dictionaries as follows:

Webster's New International Dictionary, 1932:

3. A bearing for a pivot in a watch, formed by a crystal or precious stone, as a ruby.

Funk & Wagnalls' New Standard Dictionary, 1931:

5. A bit of precious stone, crystal, or glass used to form a durable bearing, as for a watch-pivot.

The Century Dictionary & Encyclopedia, 1913:

4. A precious stone used in watchmaking, on account of its hardness and resistance to wear, as where a pivot turns in a socket.

Knight's American Mechanical Dictionary:

1. (Watchmaking.) A crystal or precious stone forming a bearing for the pivot of an arbor; especially used in watches.

The word "substitute" is defined as follows:
Webster's New International Dictionary, 1932:

One put in place of another; one acting for, or taking the place of another.

Funk & Wagnalls' New Standard Dictionary, 1931:

1. One who or that which takes the place or serves in lieu of another; one who acts or appears in another's stead;

A concise description of a watch movement having neither jewels nor bushings is set forth in the brief of the *amicus curiae*, as follows:

* * * It consists of the following: First, a mainspring which furnishes the power; second, a train of wheels through which this power moves; third, an escapement which interrupts the continuous flow of this power and permits its escape at regularly spaced intervals. Each train wheel has, of course, an axle, called a pinion or a staff, the ends of which revolve in holes in the watch plates, the whole train mechanism being confined between two such plates, or between a bottom plate, and a broken up plate, sometimes designated as bridges. Originally the ends of these axles were inserted in simple holes in the plates. * * *

Jewelled bearings for watch movements were introduced about the end of the seventeenth century. Knight's American Mechanical Dictionary.

The practice of using a bushing as a bearing in a watch movement where jewels are not used is also old. When the pivot hole in the plate became worn, a material known as bushing wire was placed in the hole and a hole was drilled in the wire to furnish the bearing. This process is described in the testimony in the case at bar, and also in a volume entitled "The American Watchmaker and Jeweler," published in 1892, at page 54.

Later one Olaf Ohlson, an employee of the Waltham Watch Co., and a witness on behalf of the Government herein, invented the process of cutting an entirely cylindrical hole in the movement plate and then making a bushing to conform to the hole so cut, making it possible to place bushings of different sizes in the hole as occasion might require without injuring the plate. For this invention said Ohlson received a patent in 1914. It appears from the testimony that in utilizing said invention the Waltham Watch Co. made the bushings (to be placed in the holes cut in the plate) of a harder material than the metal composing the plate. On direct examination the witness Ohlson testified that he had seen bushings placed in lieu of jewels many times, perhaps hundreds of times, but upon cross-examination he testified as follows:

X Q. You mean that you have seen seven-jewel watches where the seven jewels were taken out and seven bushings put in their place?—A. No. The reverse.

\* \* \* \* \* \* \*

X Q. Pardon me; you said bushings were placed in lieu of jewels, Mr. Ohlson?—A. No, no.

He further testified that occasionally he had seen specimens of repair jobs where a bushing had been put in the plate of the movement where there had previously been a jewel.

One Jacob Friestadter, a witness on behalf of the Government, is superintendent of the Waltham Watch Co. and an expert watchmaker. Upon direct examination he testified as follows:

Q. When it is desired to increase the efficiency of the watch, what process is used to effectuate that purpose?—Jewels are added for bearings in place of either plain holes or bushings.

He also testified that jewels and bushings perform the same function as a bearing for the pivot, both are removable, and both are a means for regulating the "end-shake" by moving either the jewel or bushing up or down; that he had seen a bushing placed in lieu of a jewel and a jewel placed in lieu of a bushing in a watch movement; that both functioned in the same manner, and that a bushing takes the place of or serves in lieu of a jewel.

Upon cross-examination he testified as follows:

X Q. What is the purpose of making the bushing as against the hole in the plate?—A. For better interchangeability; better means for adjusting the end shakes.

X Q. It is a better means in the process of manufacturing the watch to get at the adjustment, isn't it?—A. That is right.

X Q. So that it merely does away, so far as any functional purpose is concerned, with the adjustment in the shape of filing off the shoulder or beating down the plate to take up the end play, isn't that accurately stated?—A. It is a particular aid in adjusting the end shake.

X Q. But isn't that all it does, Mr. Freistadter?—A. No. Not exactly. It is a removable bearing. When that hole in the bushing becomes worn, we don't repair that bushing. We change it. Because it is removable, it is that much easier.

X Q. All right. Any other difference you know of?—A. None that I can cite just at the moment.

He further testified, with respect to the functions of bushings, as follows:

X Q. Does it increase the wear of that hole?—A. In our watches it does, because the bushings in our watches, the bushings are made from a different material.

X Q. *Harder than the material the plate is made out of, isn't that so?*—A. *That is right, that is right.* (Italics ours.)

X Q. So that in your watches you have a dual purpose in making bushings, and that is it, to increase the wear over the wear in the hole in the plate?—A. That is right.

X Q. And that has been true ever since you have known bushings so far as the Waltham Watch Co. is concerned?—A. So far as the Waltham Watch Co. is concerned; yes.

X Q. And that is the basis of your testimony here?—A. Yes.

William W. Bold, a witness for the Government, testified that he was a practical watchmaker, that he had seen jewels placed in watch movements in lieu of bushings, and bushings in place of jewels. With respect to placing bushings in watch movements at points where there had previously been jewels, he testified that he had observed this in perhaps a half a dozen watch movements out of probably 3,000 examined, and that he regarded such practice as poor workmanship.

Another witness for the Government, Herman E. Watson, testified that he had seen jewels removed from watches and bushings placed in the holes from which they were removed, but that he regarded this practice as poor workmanship.

The words "bouchon" and "bushing" are used interchangeably in the testimony and it is conceded that they are synonymous.

One Albert M. Smoot, a witness on behalf of appellant, testified that he was a chemist and engineer and had made a test of the relative hardness of the bushings here considered and the plate or bridge of the watch movements in question, and that both were of brass and of the same hardness. The witness Manby testified on behalf of the Government that the bridges in the exhibits before the court were made out of soft metal.

We find no conflict in the testimony that the only reason that jewels are used as pivot bearings in watch movements in preference to metal bushings is because of the hardness of the jewels and the consequent decrease of friction.

This brings us to a consideration of the meaning of the words "substitutes for jewels," as those words are used in said paragraph 367.

The word "substitute" has a very general meaning and its particular meaning in a given relation can not be determined alone from its general meaning. To illustrate, in one sense of the word, mineral water is a substitute for beer in that both beverages are used to quench thirst, but it would hardly be said that if, in addition to a tariff duty on beer, there should be a provision in the tariff act that the word "beer" should include "substitutes for beer," mineral water would be dutiable at the same rate as beer.

In the case of *Ex parte Hunnicut*, 123 P. 179, there was involved the construction of the term "substitute" as used in the prohibition law of the State of Oklahoma, making it unlawful to sell malt liquors or substitutes therefor. The court in its opinion said:

* * * It is a fact, generally known in this jurisdiction, and of which the court will therefore take judicial notice, that since the establishment of prohibition a number of people in this state habitually use coffee as a substitute for prohibited liquors. This fact is susceptible of being proven by legal evidence. Who would be bold enough to say that the use of coffee as a substitute for pro-

hibited liquors comes within the meaning of the statute, and would constitute an offense against the law? Such a construction would be to reduce the law to an absurdity. * * *

In Abstract 1575, 50 Treas. Dec. 821, the Customs Court held that merchandise invoiced as Borden's coffee, milk and sugar, and consisting of sugar, lactose, casein, caffein, coffee extract, and other ingredients, was not a substitute for coffee under paragraph 774 of the Tariff Act of 1922, which provided a duty of 3 cents per pound upon coffee substitutes. In said case it was apparent from the nature of the article that users of the merchandise there involved did use it as a substitute for coffee, and yet the court properly held, we think, that it was not such substitute within the meaning of said paragraph 774.

We make these observations for the purpose of demonstrating that, in arriving at the meaning of the words "substitutes for jewels," as used in said paragraph 367, we should not treat it as an unambiguous term not requiring construction to determine the intent of Congress in its use, but we must as best we can determine such intent.

We would first observe that these words are new in the Tariff Act of 1930. They originated in the House of Representatives, in H. R. 2667, Seventy-first Congress, Second session, which bill, after being amended, became the Tariff Act of 1930. The provision here in question for substitutes for jewels, in so far as it relates to said paragraph 367, appears in the bill as originally introduced. Later, by amendment, said provision was extended to apply also to paragraph 368.

Voluminous hearings were held by both the Ways and Means Committee of the House and the Finance Committee of the Senate upon the subject of watches and watch movements, at which hearings representatives of the United States watch industry and importers of watches and watch movements testified and filed briefs. We have examined these hearings with great care and nowhere is there found any discussion of substitutes for jewels.

It further appears that the rate on movements of the size here involved, having seven jewels, was increased from $1.25 each under the Tariff Act of 1922 to $1.75 each under the Tariff Act of 1930. This is an increase of 40 per centum in the rate of duty over the Tariff Act of 1922, but if the theory of the Government shall prevail, that bushings shall be regarded as substitutes for jewels, the rate for movements like those in question will be $2.95 each as against a rate of $1.25 each in the Tariff Act of 1922, or an increase of 136 per centum in the rate of duty, whereas the advance in the rate on watch movements of the size of those here involved, having no jewels, was from 75 cents for each movement under the Tariff Act of 1922 to $1.05 under the Tariff Act of 1930, or an advance of only 40 per centum.

We here inquire upon what possible theory we may assume that Congress intended to increase the duty upon watch movements having 15 common brass bushings 136 per centum over the rate imposed upon like movements under the Tariff Act of 1922, when a watch movement the size of those here involved, containing 15 real jewels, was dutiable at the rate of $2, if unadjusted, under the Tariff Act of 1922, and at a rate of only $2.95 each under the Tariff Act of 1930, whether adjusted or unadjusted, or an increase of only 47½ per centum over the rate imposed by the Tariff Act of 1922.

This observation is particularly pertinent when it is remembered that there is no word in the hearings before the committees of Congress, or in the reports of such committees, with respect to the question of whether bushings should be regarded as substitutes for jewels.

We have made careful search of the legislative history of the Tariff Act of 1930 to ascertain, if we can, the purpose of Congress in inserting the provision for substitutes for jewels in said paragraph 367 of the Tariff Act of 1930. The only possible light that we gain from such examination is found in the Summary of Tariff Information, 1929, volume 1, page 786, where, under the heading "Jewels For Watches, Clocks, Meters, and Compasses," it is stated as follows:

*Description and uses.*—Jewels used in watches, clocks, meters, and compasses include various kinds of stones—agate, garnet, sapphire, diamond, ruby— *and also the synthetic or manufactured ruby and sapphire.* They are used as bearings in delicate clockwork mechanisms, supporting moving parts firmly and with a minimum of friction. (Italics ours.)

It may be that Congress feared that synthetic or manufactured rubies and sapphires would not be regarded as jewels and that this was the reason for the provision relating to substitutes for jewels.

However this may be, we must conclude that Congress intended to cover some devices taking the place of jewels, but which were not real watch jewels, and our construction of the words "substitutes for jewels," as hereinafter set forth, does permit practical application of the provision to importations of watch movements.

Turning from the legislative history of the provision in question and adverting again to the evidence in the case, we find the following in the testimony of one Salomon, an expert watchmaker and a witness for appellant:

Judge KINCHELOE. Can a bouchon perform the functions of a jewel?

The WITNESS. Only in so far as, judge, as it forms a bearing for a pivot; that is all.

Judge KINCHELOE. I mean, can you have a watch that has bouchons and no jewels?

The WITNESS. Oh, yes.

Judge KINCHELOE. Well then, in that kind of a watch does the bouchon perform the function that a jewel would in a higher class watch?

The WITNESS. Well, only in so far that it forms a bearing for the pivot. That is all. That is all it does.

Judge TILSON. It is an improvement upon the system of just a hole in the case, isn't it?

The WITNESS. Absolutely; yes.

Judge TILSON. And the jewel is still an improvement on that?

The WITNESS. Exactly.

That a jewel is an improvement in a watch movement over an ordinary bushing is undisputed in the testimony. Therefore it would seem that in order to be a substitute for a jewel the substitute itself must be in some degree an improvement over an ordinary bushing, the material of which is no harder than the metal in which it is installed.

We hold that a substitute for a jewel, within the meaning of said paragraph 367, must possess, at least in some degree, that quality for which a jewel is selected in a watch movement in preference to ordinary metal bushings. The only quality that causes a jewel to be so selected is its hardness as compared with the metal of the plate, and its consequently reduced friction, and a device that does not possess this quality can not be held to be a substitute for a jewel, even though in its use it may perform some of the functions of a jewel.

The evidence clearly discloses that bushings *may* possess this quality of hardness. It appears that bushings used by the Waltham Watch Co. possess it to a certain degree, but it just as clearly appears that the bushings here involved do not possess this quality for they are cut out from the plates or bridges of watch movements, and are therefore no harder than is the metal comprising such plates or bridges. If bushings in an imported movement were in fact harder than the bridge or plate in which they were set, it could be forcefully argued that they were substitutes for jewels, for in such case they would serve, at least to a degree, the same purpose for which jewels are selected for use.

It might be considered that the collector could not determine the relative hardness of a bushing and a plate or bridge of a watch movement in which the bushing is installed without damaging a part of the watch movement. However, the method of determining the relative hardness of minerals, as shown in volume 15 of the Encyclopaedia Britannica (14th ed.), under the title "Mineralogy," page 525, is very simple, and it is apparent therefrom that the collector could make the necessary tests without damage to the parts. Such method is also described in a book entitled "A Text Book of Mineralogy," by Prof. Edward S. Dana, at pages 152, 153.

We think it is clear that it was not the intent of Congress that bushings such as are here involved should be regarded as substitutes for jewels.

We come to this conclusion from the facts hereinbefore cited, and this conclusion is further supported by the fact that under the Government's theory the movements here involved, having seven jewels and eight common brass bushings, would be dutiable at $2.95 each under said paragraph 367, while a movement of like size having 12 jewels of sapphires and rubies, and no bushings, would be dutiable at only $2.50 each. We do not think that we can ascribe to Congress any such intention.

Furthermore, the evidence shows that, in the highest class of watch movements, jewels are used exclusively; that in the medium class of watch movements, both jewels and bushings are used; and that in the lowest class neither jewels nor bushings are used.

The movements here in question were appraised at their invoice price of $2.17 each. They were assessed with duty at $2.95 each, which is 136 per centum of their foreign value, while the same movement, under the Tariff Act of 1922, would have been dutiable at only $1.25, or less than 60 per centum of its foreign value.

We can conceive no possible purpose that Congress could have had in increasing the duty upon watch movements containing 15 jewels only 47½ per centum over the rate provided for such movements under the Tariff Act of 1922, while watch movements of like size, containing 15 ordinary bushings, should bear a rate which is 136 per centum higher than the duty under the Tariff Act of 1922, and we do not think that we should ascribe to Congress any such intention under the facts as they appear in the case at bar. It is certainly true that more American labor would be involved in placing jewels in a watch movement than in placing bushings therein; it would therefore seem logical, in accordance with the theory of protection to American industries, that the rate upon watch movements containing jewels should be higher than the rate upon movements containing bushings.

We would further observe that if the watch movements here involved are classified as contended for by appellant, they still will bear an increase of duty of 40 per centum over the rate imposed upon like movements under the Tariff Act of 1922, which is in harmony with the general advance in rates upon watch movements over the rates imposed by the Tariff Act of 1922.

We hold that the bushings here involved are not "substitutes for jewels," within the meaning of those words as used in said paragraph 367 of the Tariff Act of 1930, and that the movements should be classified as containing seven jewels and assessed with duty at $1.75 each, as claimed by appellant.

The judgment of the United States Customs Court is *reversed* and the cause is *remanded* for further proceedings consistent with the views herein expressed.

BLAND, Judge, dissents.