JUAN R. MELÉNDEZ, doing business under the name of "MELÉNDEZ AUTO SALES," Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, PONCE PART, ANTONIO J. MATTA, JUDGE, Respondent; SECRETARY OF JUSTICE OF PUERTO RICO, Intervener.

No. C-63-42.        Decided June 18, 1964.

*Práxedes Álvarez Leandri* for petitioner. *J. B. Fernández Badillo, Solicitor General,* and *Peter Ortiz, Assistant Solicitor General,* for intervener.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

The decision in this case calls for our determination of (a) whether or not under the provisions of § 4 of the Weapons Law of Puerto Rico (No. 17 of January 19, 1951, 25 L.P.R.A. § 414), the instrument the carrying of which gave rise to the seizure of an automobile is a blackjack; (b) if it is not, and since it is an instrument similar to a blackjack, whether or not the carrying thereof constitutes an offense under that statutory provision; and (c) lastly, should we decide the latter question in the affirmative, whether the seizure in question was in order.

The pertinent facts of the case are recited in the findings of fact of the trial judge as follows:

"2. Juan R. Meléndez sold on conditional sale to Carlos M. Ortiz a 1958 Chevrolet motor vehicle, license No. 624-786, sticker No. 055567. In view of the fact that the selling price had not been paid in full by June 27, 1962, plaintiff had on

that date a known interest in the vehicle and, therefore, he has standing to file the present action.

"3. On June 27, 1962, the Chevrolet automobile in question was operated by Anastacio Cintrón Torres and riding therein was Carlos M. Ortiz, the conditional purchaser.

"4. An automobile accident occurred on that date in which the Chevrolet in question was involved, and when the police intervened they seized inside the vehicle *an instrument described as a 'whip' in the police report on the accident and as a 'blackjack' in the notice of seizure.* The instrument is 20½ inches long and has a leather handle 6 inches long on one end. On the other end it has a lead head 2 inches long and ¾ inch in diameter, and 6 inches below the lower end it has another handle similar to that described above. The inside appears to be of leather-covered flexible metal. (See exhibit I.)

"5. *By its description it is similar to a* 'blackjack,' the only difference being its size. It is clearly an offensive weapon." (Italics ours.)

The police report on the instrument in question reads that "detective Vázquez noticed that underneath the front seat of the car, or on the floor under the driver's seat, there was a brown *whip* 26-1/2 inches long and 1-1/2 inches thick containing lead in one of its ends. The latter was seized by the detective who in turn showed it to the occupants of the car, and asked them whether the *whip* belonged to any of them. . . ."

"This case involving the whip was referred to the district attorney of the Superior Court of this . . . .

". . . The whip in question was left as evidence in the office of the district attorney." (Italics ours.)

The minutes of the hearing of the case in the trial court reads as follows:

"The parties offer in evidence a *whip* and the police report jointly with a stipulation." (Italics ours.)

The trial court concluded that since the instrument seized is *similar to a blackjack*, the same is a prohibited weapon and the seizure thereof inside the vehicle entails the confisca-

tion of the latter, and, therefore, it dismissed appellant's complaint challenging the confiscation.

In criminal law, the essence of the principle of legality—the rule of law—consists in the limitation on penalization effected by the application of specific rules. That is the actual meaning of the old maxim *nulla poena sine lege* and of the even narrower expression known as *nullum crimen sine lege*. The principle of legality requires that in the interpretation of a penal statute the trier confine himself to the well-established meaning of the words, to their ordinary meaning, instead of to the meaning induced from the general purpose or "legislative intention" of the statute. However, in the Anglo-Saxon jurisdictions from where our criminal law is taken there exists a *residuum* of the common law, wherefore the doctrine of *nullum crimen* does not apply in its entirety. However, a strong tradition prevails in these jurisdictions which imposes a strict construction on the extent of penal statutes. Hall, General Principles of Criminal Law 27-64 (2d ed.); Quarles, *Some Statutory Construction Problems and Approaches in Criminal Law*, 3 Vand. L. Rev. 531 (1950).

Both the statutory provisions in this jurisdiction and our decisions clearly maintain the doctrine of strict construction in matters of penal law. Section 3 of the Penal Code provides the following:

"All provisions and sections of this Code are to be construed according to the fair construction of their terms, with a view to effect its object and to promote justice."

And § 5 of that Code provides:

"No person shall be arrested for any crime or offense unless such crime or offense is expressly declared in this Code, except for crimes and offenses against the laws of the United States applicable to Puerto Rico and the enactments of the Legislative Assembly of Puerto Rico and laws enacted by Congress of the United States for Puerto Rico."

Section 14 of the Civil Code (31 L.P.R.A. § 14) provides that: "When a law is clear and free from all ambiguity, the letter of the same shall not be disregarded under the pretext of fulfilling the spirit thereof." In the dissenting opinion of Mr. MacLeary—then Associate Justice of this Court—in *The People* v. *Benítez*, 19 P.R.R. 235, 250 (1913), it is correctly said that § 14 "applies as well to criminal as to civil laws." See, also, *The People* v. *Ramos*, 18 P.R.R. 954, 964 (1912). In our Law of Evidence we find the following normative provision: "In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (32 L.P.R.A. § 1669.)[1] In *Benítez, supra*, Mr. Justice MacLeary further said that: "The primary canon of construction to which all others must yield is that a Legislative Act is to be interpreted according to the intention of the Legislature apparent upon its face"; and that *"where a law is expressed in plain and unambiguous terms,* whether those terms are general or limited, the Legislature should be held to mean what they have plainly expressed and consequently *no room is left for construction."* At the end of the opinion of the Court in that case, at p. 245, it says: "Any doubt that may arise must be resolved in favor of the liberty of the individual and the freedom of the defendant"; and that where "the statute being consid-

---

[1] On numerous occasions we have made pronouncements giving effectiveness to the policy announced in the texts copied above of the Civil Code and of the Law of Evidence. *Irizarry* v. *Registrar*, 61 P.R.R. 70 (1942); *Rexach Racing & Sport. Corp.* v. *Ins. Rac. Comm.*, 60 P.R.R. 352 (1942); *Cabassa* v. *Bravo*, 21 P.R.R. 173 (1914); *People* v. *González*, 20 P.R.R. 553 (1914); *Fajardo Sugar Co.* v. *Santiago*, 19 P.R.R. 1178 (1913).

ered is a penal and criminal one . . . is to be strictly construed." In *The People* v. *Terrasa*, 28 P.R.R. 10, 12 (1920), reiterating the holding in *Lange* v. *The People*, 24 P.R.R. 796 (1917), we said:

". . . in order that a person may be punished as a violator of a penal law, it is necessary that the act or omission to be punished should be clearly expressed in the law, for no man should be convicted of a crime that is not clearly defined and penalized by the laws, and the language of the law should never be stretched by construction to include any offense not plainly within the contemplation of the legislature."

In *Parrilla* v. *Loíza Sugar Company*, 49 P.R.R. 582, 585 (1936), we said that "The rule of strict construction does not require nor can it justify the elimination by judicial legislation of any part of a law, whatever the opinion of the court may be as to the wisdom of the enactment." It is proper to add that where the terms of a statute are clear and open to an unambiguous interpretation according to the common and usual meaning of its words and its grammatical construction, under the same rule we should neither interpolate words nor supply omissions by construction.[2] McCaffrey, Statutory Construction 25 and 55, §§ 7 and 25 (N.Y. 1953); Crawford, The Construction of Statutes 269 and 270 (St. Louis 1940). In *Clínica Juliá* v. *Sec. of the Treasury*, 76 P.R.R. 476, 486 (1954), we said that:

"The judge is an interpreter and not a creator. His power of construction acquires relevance when several probable meanings arise from the statute which furnish an adequate margin for judicial selection, but if the language is so unequivocal as to suggest only one meaning, a full sense of judicial humility and self-discipline requires the application of the legislative will."

---

[2] In *Atiles, Mgr. State Ins. Fund* v. *Industrial Com'n*, 77 P.R.R. 15, 20 (1954), we supplied an omission in a workmen's compensation statute "to accomplish the main purpose of the Legislature to establish different compensations."

■■ Although in common-law jurisdictions the punctuation is no part of a statute,[3] however, when the statute is open to two constructions and there is nothing to show which of them was intended by the legislature, the punctuation should govern when it supports one construction and is inconsistent with the other. Nor should a punctuation be disregarded in construing a statute when actually it helps to convey a precise meaning. Black, Handbook of Construction and Interpretation of the Laws 263-69 (2d ed. 1911) ; Crawford, *op. cit.* at 342–44.

Let us examine next § 4 of the Weapons Law of Puerto Rico, which is the penal statute under consideration, in the light of the statutory rules which we have just stated. It reads as follows:

"Any person who possesses, bears or carries any weapon of the kind commonly known as blackjack, billy, or metal knuckles; and except when they are borne or carried on the occasion of their use as instruments proper of an art, sport, profession, occupation, or trade, any person who bears or carries any weapon of the kind commonly known as knife, dirk, dagger, sword, slingshot, sword cane, spear, jackknife, stiletto, icepick, or any similar instrument, including also safety razor blades and bludgeons when drawn, exhibited, or used in the commission of a public offense or in the attempt of such commission;

---

[3] Even in those jurisdictions the advisability of such rule in connection with the punctuation has been questioned.

"It is quite generally stated that the punctuation of a statute is no part of the statute. *Hammock* v. *Loan & Trust Co.*, 105 U.S. 77 . . . . 'This general rule in its origin was founded upon common sense, for in England until 1859 statutes were enrolled upon parchment and enacted without punctuation. No punctuation appearing upon the rolls of Parliament, such, as was found in the printed statutes, simply expressed the understanding of the printer. *Such a rule is not applicable to conditions where, as in this state, a bill is printed and is on the desk of every member of the legislature, punctuation and all, before its final passage. There is no reason why punctuation, which is intended to and does assist in making clear and plain the meaning of all things else in the English language, should be rejected in the interpretation of statutes.' Taylor* v. *Caribou*, 67 Atl. 2." Crawford, The Construction of Statutes 342, n. 147 (St. Louis 1940). (Italics ours.)

and any person who uses against another any of the weapons above named in this section, shall be guilty of a misdemeanor and if previously convicted of any violation of this chapter, or of any of the offenses listed in section 427 of this title, shall be guilty of felony."

■ In the first place, in the first enumeration the statute refers to "any weapon of a kind commonly known as blackjack, billy or metal knuckles." According to the record, neither the police, who have recognized experience in connection with the weapons enumerated in that statute, nor the trial judge identified as a blackjack what was found in the vehicle confiscated, so that we cannot conclude that the object in question was a weapon of the kind *commonly* known as blackjack. The appreciation of those officers was correct, since the characteristic of a weapon of this kind is that it be short, consisting also of a heavy head on one end and a flexible handle, so that it can be carried concealed. *People* v. *Canales*, 55 P.2d 289 (Cal. 1936); *People* v. *Mulherin*, 35 P.2d 174 (Cal. 1934); 5 Words and Phrases 528; Black, Law Dictionary 215; Webster's New Collegiate Dictionary 89 (2d ed. 1959).

*Canales, supra,* sustained an information for carrying a weapon of the kind known as blackjack or billy, consisting of a piece of wood about the thickness of a pick handle, 18 inches long, on the ground that the instrument was actually a billy and not a blackjack as recited in the information, since the court emphasized that the blackjack is a short bludgeon, having a flexible handle and thicker at one end. Although in *Mulherin, supra,* it was said that although the instrument in question was a slungshot, the information for carrying a blackjack was sustained on the ground that the instrument was *of the kind of a blackjack,* and the statute in this case forbade *"the ownership of any instrument of the kind commonly known as blackjack."* (Italics ours.) The circumstances of that case were completely different from

those in the instant case, since the instrument in *Mulherin* was by its description almost identical with a blackjack, a weapon of the kind, according to the California statute, while in the case under consideration the statutory enumeration of the weapons is more restrictive and limited, and the instrument in question by its size and design cannot be considered a blackjack, nor a weapon of that kind, nor any of the other two weapons enumerated in the statute. As concluded by the trial judge, it is at the most *similar to a blackjack*.

In dismissing the challenge of the seizure in this case, the trial court held that the carrying of an instrument similar to a blackjack is a criminal act under § 4 of the Weapons Law. It is alleged that this conclusion is supported by the holding in *People* v. *Jiménez*, 74 P.R.R. 237, 259 (1952). This is not correct. It is true that in the latter case we said that: "To state an offense under § 4 [Weapons Law] it was therefore necessary for the information either to specify one of the weapons named in § 4 or to allege that it was 'a similar instrument' to one of those set forth in the statute." However, a statement such as this cannot be invoked as authority by separating the same from the specific facts which gave rise thereto. In that case an individual was charged with carrying a folding knife which, if covered by § 4, would be only under the second enumeration of cutting or sharp weapons *or any similar instrument*, rather than under the first enumeration of blackjacks, billies, and metal knuckles, which enumeration does not include *other similar ones*. The interesting point is that in *Jiménez, supra*, it was held that the information was defective because, since folding knife was not specifically enumerated in the statute, it was necessary to resort to the definition of that instrument in § 44 (d) of the Weapons Law which provides that the folding knife must be three or more inches long, a circumstance which was not alleged in the information. Notwith-

standing the inclusion of the phrase "other similar instrument" in the second enumeration, § 4 was strictly construed in the light of another provision of the Weapons Law.

It is alleged that the recapitulation term "or any similar instrument" applies by analogy to the first group of weapons as well as to the second group included in § 4, and that to that effect the semicolon which separates the two groups does not establish two different categories. A careful analysis of § 4 shows, without doubt, that it covers three criminal situations, three related thoughts the contents of which are clearly separated and defined. Grammatically they are three sentences separated by a semicolon for the purpose of prescribing a penalty common to the three situations. This is deduced from the clear wording of the statute. It should be noted that as to the first group of weapons, namely, "those commonly known as blackjacks, billies, or metal knuckles," their *possession, bearing or carrying* is punishable. As to the second group, only the *bearing or carrying thereof* is punishable. The exception of those borne as instruments proper of an art, sport, profession, or trade, obviously must refer only to the second group of weapons. Razor blades and bludgeons are next included as part of the second enumeration, with the limitation that the drawing, exhibition, or use in the commission of a public offense constitutes an offense. The third and last situation covers the use by a person against another "of any of the weapons above named." To hold that the phrase "or any similar instrument" applies to blackjacks, billies, or metal knuckles of the first group of weapons amounts to supplying an omission in an effort to effectuate a legislative intention which is not apparent from the text of the Weapons Law. If this is proper, after the effect of the semicolon disappears, we would also have to supply the omission of *possession* in the second group of weapons, and to conclude also that the phrase of exception of the weapons on the occasion of their use as

instruments of art, sport, profession, occupation, or trade also covers blackjacks, billies, or metal knuckles, all of which would be absurd as repugnant to the clear and specific terms of the statute. On the contrary, § 2 of the Law (25 L.P.R.A. § 412) prohibits the manufacture, importation, sale, delivery, or distribution of "the weapons or instruments of those commonly known as blackjacks, bludgeons, or brass knuckles," and the phrase "or any similar instrument" was not included in this enumeration. It seems obvious that if the legislative intent had been to cover under the Weapons Law the instruments similar to blackjacks, billies, or brass knuckles, it would have so specified in its § 2, where reference is first made to these weapons. The failure to do so is indicative rather of an intent to the contrary, perhaps to prevent vagueness[4] by the addition of the similarity phrase to the enumeration of the weapons commonly known as blackjacks, billies, or metal knuckles, since these weapons do not have a common characteristic which will permit to determine clearly which are similar, as is the case with the second group, which constitutes an enumeration of cutting or sharp weapons. Under the rule of last antecedent, the phrase "or any similar instrument" should be applied to the enumeration of weapons immediately preceding and not to the most remote group of weapons. We fail to find in the statute the slightest legislative indication to prevent the application of this rule. *Mayagüez Sugar Co.* v. *Carreras, Acting Treas.*, 59 P.R.R. 716 (1942); *Bowie* v. *Buscaglia, Treas.*, 63 P.R.R. 525 (1944).

In *Commonwealth* v. *Kelly*, 58 N.E. 691 (Mass. 1900), the question involved was the interpretation of a statute

---

[4] *Baggett* v. *Bullitt*, decided by the Supreme Court of the United States on June 1, 1964 (32 U.S. L. Week 4425), contains an elaborate exposition of the doctrine on the invalidity of the statutory provisions on the ground that they are unduly vague, uncertain and broad.

under circumstances very similar to those of the case under consideration. The statute provided:

". . . that no sale of spirituous or intoxicating liquor shall be made between the hours of eleven at night and six in the morning; nor during the Lord's day, except that if the licensee is also licensed as an innholder, he may supply such liquor to guests who have resorted to his house for food and lodgings."

The question raised was whether the exception in favor of innkeepers permitted them to serve liquor to their guests between the hours of 11 at night and 6 in the morning. The court said that: "The ordinary rule of construction in a case like this confines the exception to the last antecedent." After pointing out the legislative intention to forbid the sale of liquor during late hours of the night, the court added that: "As the act is printed . . . there is a semicolon after the word 'morning,' although when the original act was first published the point used was a comma. If this punctuation is given full effect as an indication of the meaning to be expressed in reading the act, the case is free from question . . . it may be resorted to as an aid in construction when it tends to throw light on the meaning . . . . We are of opinion that the exception does not apply to sales made between the hours of 11 at night and 6 in the morning."

This case has been cited several times with approval, the last time in *Burnham* v. *Mayor and Aldermen of Beverley*, 35 N.E.2d 242, 245 (Mass. 1941).

Should the public policy be that the possession, bearing, or carrying of instruments such as that seized in this case constitutes a criminal act, it is incumbent on the Legislative Assembly and not on this Court to amend § 4 of the Weapons Law in the manner and to the extent which may be proper.

For the reasons stated, the judgment will be reversed and it is ordered that the bond given by appellant pursuant

to § 2 (b) of the Uniform Vehicle, Mount, Vessel and Plane Seizure Act (34 L.P.R.A. § 1722 (b)) be cancelled.*

—O—

Separate vote of MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ.

San Juan, Puerto Rico, June 18, 1964

Although I am agreeable with the scope attributed by the opinion of the Court, speaking through Mr. Justice Ramírez Bages, to § 4 of the Weapons Law which, being a penal statute, is subject to a strict construction as to the kind of weapons comprised in the first modality of the offense, the possession, bearing, or carrying of which is punishable, namely, the weapons "commonly known as blackjacks, billies, or metal knuckles," I do not subscribe to that part of the opinion—in the belief that it is not wholly tenable nor necessary in this case—which refers to rules of construction and to civil and penal jurisprudence on rules of statutory construction, making conceptual generalizations which to me are not clearly applicable nor effective at present, according to the live sense and social function of the law in our times.

On the other hand, in view of the result reached in that opinion in the sense that what was seized in the vehicle confiscated was not a blackjack—wherefore we annulled the

---

* "The Chief Justice concurs in said opinion in a separate vote, in the first part of which Mr. Justice Rigau concurs. Mr. Justice Belaval, in a separate opinion in which Mr. Justice Hernández Matos concurs, states that the reversal of the judgment should be based on the impropriety of the confiscation. Mr. Justice Santana Becerra concurs in the opinion of the majority but states that in the assumption that an offense was committed he would be agreeable with the impropriety of the confiscation for the reasons stated in the opinion of Mr. Justice Belaval. Mr. Justice Rigau and Mr. Justice Dávila concur in the result.

Mr. Justice Blanco Lugo, who concurs in the opinion of the Court, delivered a separate opinion on the aspect of the legality of the confiscation, with whom concur Mr. Justice Pérez Pimentel (who also concurs with the majority) and Mr. Justice Rigau, Mr. Justice Dávila and Mr. Justice Ramírez Bages."

confiscation—I believe it is proper to refrain from expressing any criterion on the examination which is made in the other opinions of the existing doctrines on confiscation in our case law.

—O—

Opinion of MR. JUSTICE BELAVAL in which MR. JUSTICE HERNÁNDEZ MATOS concurs. MR. JUSTICE SANTANA BECERRA concurs in the second question on confiscation.

San Juan, Puerto Rico, June 18, 1964

Following the proceeding authorized by Act No. 39 of June 4, 1960, as amended by Act No. 10 of September 1, 1961—34 L.P.R.A. § 1722 (Supp. 1962, pp. 44–46)—Juan R. Meléndez, doing business under the name of Meléndez Auto Sales, challenged the confiscation by the Secretary of Justice of a 1958 Chevrolet automobile, license 624-786, sticker 055567, sold under a conditional sales contract to Carlos M. Ortiz, because in that automobile "a blackjack was being carried, *transported,* borne, taken and transferred in violation of the law." The conditional vendor alleges that a whip and not a blackjack was being carried in the automobile sold to Carlos M. Ortiz. The description of that weapon made by the trial judge is as follows: "The instrument is 20-1/2 inches long and has a leather handle 6 inches long on one end. On the other end it has a lead head 2 inches long and 3/4 inch in diameter, and 6 inches below the lower end it has another handle similar to that described above. The inside appears to be of leather-covered flexible metal . . . . By its description it is similar to a blackjack, the only difference being its size. It is clearly an offensive weapon."

The law applicable to this kind of carrying is § 4 of Act No. 17 of January 19, 1951 (Sp. Sess. Laws, p. 426), which provides: "Any person who possesses, bears or carries any weapon of the kind commonly known as blackjack, billy, or

metal knuckles; and except when they are borne or carried on the occasion of their use as instruments proper of an art, sport, profession, occupation, or trade, any person who bears or carries any weapon of the kind commonly known as knife, dirk, dagger, sword, slungshot, sword cane, spear, jackknife, stiletto, icepick, or any similar instrument, including also safety razor blades and bludgeons when drawn, exhibited, or used in the commission of a public offense or in the attempt of such commission; and any person who uses against another any of the weapons above named in this section, shall be guilty of a misdemeanor . . . ."

The conditional vendor, appellant herein, alleges that an illegal transportation cannot be imputed to conditional vendee Ortiz because, even if it should be concluded that the whip is an instrument similar to a blackjack, or billy, the Act does not declare that the carrying of an instrument similar to a blackjack, billy, or metal knuckle constitutes an offense, as it does in declaring that the carrying of a knife, dirk, dagger, sword, slungshot, sword cane, spear, jackknife, stiletto, icepick, or *any similar instrument* shall constitute an offense.

The fact that in an enumeration the first group of weapons or instruments of aggression is separated from the second group by a semicolon does not establish a distinct category capable of creating an exception of offense. It is known that all the parts which compose an enumeration are always considered comprised in a totality. Since this is so, the recapitulation term "or any similar instrument" applies by analogy to the first group of weapons as well as to the second. The objective of an act cannot be left at the mercy of the situation of a punctuation mark within its text.

The second question raised relative to the erroneous weighing of the evidence compels us to examine a mixed question of substantive law and procedure.

The authority of the Secretary of Justice to confiscate an automobile engaged in transporting a prohibited weapon stems from § 37 of Act No. 17 of January 19, 1951, as amended by Act No. 39 of June 4, 1960 (Sess. Laws, p. 66), which provides:

"The Secretary of Justice shall seize any vehicle, mount, vessel or plane which loads, unloads, transports, carries, or transfers, or which is used for loading, unloading, transporting, carrying, or transferring; or which is caught loaded, or in the act of loading, unloading, transporting, carrying or transferring any weapon in violation of this act.

"For the seizure and disposal of vehicles, mounts, vessels or planes, there shall be followed the same procedure established by the act known as 'Uniform Vehicle, Mount, Vessel and Plane Seizure Act.'"

The Uniform Vehicle, Mount, Vessel and Plane Seizure Act—No. 39 of June 4, 1960, as amended by Act No. 10 of September 1, 1961, 34 L.P.R.A. § 1722 (Supp. 1962, pp. 44–46)—provides:

"(a) The proceeding shall be begun by the seizure of the property by the Secretary of Justice, the Secretary of the Treasury or the Police Superintendent, through their delegates, policemen or other peace officers. The officer under whose authority the action is taken *shall serve notice on the owner of the property seized or the person in charge thereof or any person having any known right or interested therein,* of the seizure and of the appraisal of the properties so seized, said notice to be served in an authentic manner, within ten (10) days following such seizure and such notice shall be understood to have been served upon the mailing thereof with return receipt requested. *The owners, persons in charge, and other persons having a known interest* in the property so seized may challenge the confiscation within the fifteen (15) days following the service of the notice on them, through a complaint against the officer under whose authority the confiscation has been made, on whom notice shall be served, and which complaint shall be filed in the Part of the Superior Court corresponding to the place where the seizure was made and shall be heard without subjection to

docket. All questions that may arise shall be decided and all other proceedings shall be conducted as in an ordinary civil action. Against the judgment entered no remedy shall lie other than a certiorari before the Supreme Court, limited to issues of law. The filing of such complaint within the period herein established shall be considered a jurisdictional prerequisite for the availing of the action herein authorized.

"(b) Every vehicle, mount, or any vessel or plane so seized shall be appraised as soon as taken possession of by the officer under whose authority the seizure took place, or by his delegate, with the exception of motor vehicles, which shall be placed under the custody of the Office of Transportation of the Commonwealth of Puerto Rico, which shall appraise same immediately upon receipt thereof.

"In the event of a judicial challenge of the seizure, the court shall, upon request of the plaintiff and after hearing the parties, determine the reasonableness of the appraisal as an incident of the challenge.

"Within ten (10) days after the filing of the challenge, the plaintiff shall have the right to give bond in favor of the Commonwealth of Puerto Rico before the pertinent court's clerk to the satisfaction of the court, for the amount of the assessed value of the seized property, which bond may be in legal tender, by certified check, hypothecary debentures, or by insurance companies. Upon the acceptance of the bond, the court shall direct that the property be returned to the owner thereof. In such case, the provisions of the following paragraphs (c), (d) and (e) shall not apply.

"When bond is accepted the subsequent substitution of the seized property in lieu of the bond shall not be permitted, said bond to answer for the seizure if the lawfulness of the latter is upheld, and the court shall provide in the resolution issued to that effect, for the summary forfeiture execution of said bond by the clerk of the court and for the covering of such bond into the general funds of the Government of Puerto Rico in case it may be in legal tender or by certified check; the hypothecary debentures or debentures of insurance companies shall be transmitted by the pertinent clerk of the court to the Secretary of Justice for execution.

"(c) After fifteen (15) days have elapsed since service of notice of the seizure without the person or persons with interest

in the property seized have filed the corresponding challenge, or after twenty-five (25) days have elapsed since service of notice of the seizure without the court's having directed that the seized property be returned on account of the bond to that effect having been given, the officer under whose authority the seizure took place, the delegate thereof, or the Office of Transportation, as the case may be, may provide for the sale at auction of the seized property, or may set the same aside for official use of the Government of Puerto Rico. In case the seized property cannot be sold at auction or set aside for official use of the Government, the property may be destroyed by the officer in charge, setting forth in a minute which he shall draw up for the purpose, the description of the property, the reasons for its destruction and the date and place where it is destroyed, and he shall serve notice with a copy thereof on the Secretary of Justice.

"(d) In case the vehicle, mount, or vessel or plane is sold at auction, the proceeds from the sale shall be covered into the general fund of the Government of Puerto Rico, after deducting and reimbursing expenses incurred.

"(e) If the seizure is judicially challenged and the court declares same illegal, the Secretary of the Treasury of Puerto Rico shall, upon presentation of a certified copy of the final decision or judgment of the court, pay to the challenger the amount of the appraisal or the proceeds from the public auction sale of such property, whichever sum is the highest, plus interest thereon at the rate of 6% per annum, counting from the date of the seizure."

The original source of this institution of law is the principle consecrated by the English common law that the property unlawfully used by the offender to commit an offense did not pass to the Crown until a conviction of the user was had—3 A.L.R.2d 740, § 2 (1949). Owing to this common-law background, in American law the so-called confiscation in rem is always made on the authority of an express statutory declaration, although, in the absence of such express declaration, attempt is made to find such legislative intention in the general context of the law or in the scope or limitation of the remedies therein provided.

What distinguishes a confiscation in rem from a confiscation in personam is that the former denies to the owner of the property, or to the possessor in charge thereof, or to any person having some legal interest thereto, every right to claim the property even if he can establish his innocence with respect to the illicit use made of the property. In the confiscation in personam, the right to claim the property is recognized to the above-named persons by establishing their innocence as to the illicit use, unless the thing involved is dangerous per se, as in the case of a deadly weapon or of a thing declared a public nuisance by the statute itself, as are implements used to counterfeit bills or print clandestine lotteries. As to the automatic seizure of a thing which is dangerous per se, see *Downs* v. *Porrata, Pros. Atty.*, 76 P.R.R. 572, 578–79 (Belaval) (1954).

Having examined Act No. 39 of 1960 in its entirety, we first notice the absence of an express declaration on the nature in rem of the authorized confiscation. Like every civil law bearing indirectly on the commission of an offense, its corrective purpose parts from the premise of a person guilty of its violation. As to the innocent parties, although there is no express exception in their favor, a proceeding of the nature of in personam is established in which "The owners of the property so seized, those in charge thereof and those having any known right or interest therein shall be served notice of the seizure and of the appraisal . . . and they may challenge the confiscation . . . through a complaint against the Secretary of Justice or the Secretary of the Treasury . . . and all questions which may arise shall be decided and all other proceedings shall be conducted as in an ordinary civil action." As to the exclusiveness of this remedy and the jurisdictional character of the terms thereof, see *Secretary of Justice* v. *Superior Court*, 89 P.R.R. 562, 567–68 (Blanco Lugo) (1963).

The Act authorizes the claimant in good faith "to chal-

lenge the confiscation" or to establish the "illegality of the confiscation."

It may be said in general that, by the use of a justiciable criterion, we have been polishing the concept of "illegality" so as to make it compatible with the greatest protection possible to the interest of the owner of the vehicle and the third parties having some interest thereto, when it is established that they have not had knowledge nor participated in the illicit use which gave rise to the confiscation. See *Ochoteco* v. *Superior Court*, 88 P.R.R. 500, 511 (Santana Becerra) (1963), in which we said: "In the light of our decisions, even though they have followed a restrictive criterion in favor of confiscation, we cannot agree with the trial court that the only answer in situations such as these is the fact that the action is directed against the thing '*res*,' so that the rights of innocent third parties are neither involved nor protected. Such generalization of the applicable rule of law is not proper in all cases. Each case must be examined and weighed in the light of its own facts, since the nature '*in rem*' of the action does not divest it of its essentially punitive condition and of inflicting punishment. The prevailing principle herein is clear, which we do not alter at all, that one who grants or delivers the possession of a vehicle ordinarily assumes the risk of the illegal use to which it may be devoted. However, not every delivery of the possession has similar motivations, nor identical justification, nor the same necessity, nor similar purposes. This case must be decided on its own facts."

In this case the trial court concluded, in deciding the second question, that the seizure of the prohibited weapon inside a vehicle carries the confiscation of the vehicle, irrespective of whether the claimant in this case, a conditional vendor to whom the sum of $1,132.80 is still owing under the conditional sales contract whereby the automobile was acquired, had no knowledge of the illicit use nor took part in

the commission of the offense. In *Commonwealth* v. *Superior Court*, 76 P.R.R. 789 (1954), we did not consider the innocent interest of the owner or of any other interested party, as we did in *Sánchez* v. *Treasurer*, 72 P.R.R. 127, 130 (De Jesús) (1951). Considering the instant case in the light of our decisions in *Sánchez* and *Ochoteco*, that part of the judgment ordering the confiscation will be reversed, and, hence, the bond given in substitution of the personal property confiscated will be cancelled.

Mr. Justice Santana Becerra wishes to say that, in the assumption that an offense was committed, he would be agreeable with the impropriety of the confiscation for the reasons stated in this opinion.

—O—

Separate opinion of MR. JUSTICE BLANCO LUGO on the question of the legality of the confiscation, in which MR. JUSTICE PÉREZ PIMENTEL, MR. JUSTICE RIGAU, MR. JUSTICE DÁVILA, and MR. JUSTICE RAMÍREZ BAGES concur.

San Juan, Puerto Rico, June 18, 1964

In *General Motors Acceptance* v. *Brañuela*, 61 P.R.R. 701, 705 (1943), we adopted the rule to the effect that "the confiscation proceeding is directed against the vehicle itself and not against its owner and that therefore the rights that upon said vehicle could be had by innocent third parties are not protected, except in those cases in which it is proved that the possession of the vehicle has been obtained by the violator without the express or implied consent of the owner or of third innocent parties, as happens when the vehicle has been stolen." We added that "if the owner or third innocent party directly or indirectly has placed the vehicle in the possession of the violator or of the person under whose orders he acts, the rights of the owner or of the third innocent party, under

such circumstance, runs the risk that goes along with whatever use to which the one in possession dedicates the vehicle." In applying this rule, we sustained the confiscation of a vehicle belonging to Petra Brañuela which was operated by Juan Reyes Matías to transport alcoholic beverages to which the corresponding internal-revenue stamps had not been affixed.

Since then we have consistently applied this rule—*Torres* v. *Buscaglia, Treas.*, 68 P.R.R. 314 (1948); *Martínez* v. *Buscaglia, Treas.*, 69 P.R.R. 406 (1948); *General Motors Acceptance* v. *District Court*, 70 P.R.R. 898 (1950); *Metro Taxicabs* v. *Treasurer*, 73 P.R.R. 164 (1952); *Stuckert Motor Co.* v. *District Court*, 74 P.R.R. 494 (1953); *Commonwealth* v. *Superior Court*, 76 P.R.R. 789 (1954).

*Sánchez* v. *Treasurer*, 72 P.R.R. 127 (1951); *Downs* v. *Porrata, Pros. Atty.*, 76 P.R.R. 572 (1954); and *Ochoteco* v. *Superior Court*, 88 P.R.R. 500 (1963), call for separate comments. In *Sánchez* a passenger introduced alcoholic beverages in the vehicle without the owner having knowledge or taking part in the transportation of the liquor. We thus distinguished the *Brañuela* case stating that if the person in charge of the vehicle is not guilty of the violation committed, the confiscation to the prejudice of the owner or interested party did not lie either. It is significant that in *Metro Taxicabs, supra*, the confiscation was sustained on the ground that the chauffeur of the taxicab knew that liquor was being illegally transported, and this knowledge was imputed to and prejudiced the owner of the vehicle. In *Ochoteco* the opinion carefully emphasizes that the facts permit an appreciation that the employee committed an offense of burglary of use, which is precisely one of the exceptions recognized in *Brañuela*. And *Downs* v. *Porrata, supra*, does not have greater scope than to establish that the effects of a pardon granted by the Governor extends to the property confiscated in connection with

the commission of the offense for which the pardon has been granted.

The situation of the averments in the case at bar does not warrant discussion of the legality of the confiscation. The question was not raised in the complaint because appellant merely alleged that "a blackjack nor any other weapon of those specified in Act No. 17 of January 19, 1951, as amended, was not being carried, transported, borne, or transferred in the vehicle, and it is alleged on the contrary that what was seized in the vehicle was a whip, the confiscation being illegal and arbitrary." The trial court rejected this contention, and it is precisely because in our opinion it is proper that we are reversing the judgment.

Neither do the findings of fact permit a holding that the defense of innocent third party was raised. What is more, what they show is that at the time of seizing the whip the vehicle was operated by Anastacio Cintrón, "and the conditional vendee, Carlos M. Ortiz, was also riding therein." From the foregoing the presumption would be that the owner of the automobile had knowledge, and what is more controlling, that the vehicle was being operated with his consent. According to the doctrine in *Brañuela, General Motors* and *Stuckert Motors Co.*, this knowledge would defeat any averment of innocent third party which the conditional vendor could have made.

Nor can I agree either that the absence in the Uniform Vehicle, Mount, Vessel and Plane Seizure Act, No. 39 of June 4, 1960, 34 L.P.R.A. § 1720 *et seq.*, of an express declaration on the nature in rem of the confiscation has the importance sought to be attributed to it. This measure is but a law of procedure. The authority for the confiscation continues to be the corresponding provisions of the Weapons, Bolita, Excise Tax, Beverages, and Drugs and Narcotics Acts which, as to the character and extent of the Secretaries of Justice and of the Treasury, as the case may be, have not

changed substantially since the decision in *Brañuela*. I admit that Act No. 39 authorizes the challenge of the confiscation by an interested party, but this has always been so, and it has added nothing new to the state of the local law. On the other hand, it is highly significant that the norm of *Brañuela* has prevailed for more than 20 years and the Legislative Assembly has not deemed it convenient to modify or change it. That is not the function of this Court.

I have elaborated on this vote in order to establish clearly and without doubt that the norm still prevailing on the propriety of confiscations in which rights of third parties are involved is that announced in *Brañuela* and to which we have consistently adhered.